---

## THE ADA.

(District Court, S. D. New York. December 22, 1916.)

1. SHIPPING ⊚⊸58(3)—CHARTERS—DAMAGES FOR BREACH.

The general rule that, on withdrawal of a ship from a charter, the charterer is entitled to damages measured by the difference between the charter hire and the hire necessary to secure another vessel, applies only when a substitute can be procured equal to the vessel withdrawn. If that cannot be done, the charterer is entitled to recover lost profits based upon the usual rates of freight at the time and place and the cargo that could probably have been obtained.

2. SHIPPING ⊚⊸58(3)—CHARTERS—DAMAGES FOR BREACH.

To entitle a charterer to damages because, as a result of the withdrawal of the chartered ship, he substituted another then under charter to him, at a sacrifice of her own cargo, to carry the cargo engaged for the one withdrawn, by which he sustained a loss, it must be shown that such action was a fair exercise of judgment to minimize the damages.

3. DAMAGES ⊚⊸67—INTEREST—DISCRETION.

In admiralty, the allowance of interest on damages recovered is within the discretion of the court.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 135, 136.]

In Admiralty. Suit by the Universal Transportation Company, Incorporated, against the steamship Ada and the Rederiaktiebolaget Amie. On exceptions to commissioner's report.

Charles R. Hickox, of New York City, for libelant.

William J. Conlen, of Philadelphia, Pa., and Engel Bros., of New York City, for respondent.

LEARNED HAND, District Judge. The commissioner's report gives the general facts in this cause with enough detail to justify the omission of any preliminary statement, and I may therefore proceed at once to the specific matters in dispute as shown by the exceptions:

First. What was the primary damage from the loss of the outward voyage from New York to Genoa, about May 1, 1916?

Second. What was the loss of the future return voyage from Genoa to New York at the end of May, 1916?

Third. What was the indirect damage caused by the loss of freight on the Zealandia?

---

⊚⊸For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Fourth. What were the indirect damages from the loss of freight on the Sarnia and to the general good name of the libelant?

Fifth. What was the net freight for which the respondents were accountable to the libelants?

Sixth. What were the incidental items with which the respondents are chargeable?

Seventh. With what payments under the charter party should the libelants be charged?

Eighth. How interest should be computed, if at all?

[1] *The Outward Voyage.* Much confusion existed throughout the taking of the proof and in the presentation of the respondents' case in court through a misapprehension of the theory of the libelants' chief claim; i. e., the claim for the outward voyage. The libelants were obviously bound by the general rule of damages that the withdrawal of the ship entitled them prima facie to damages measured by the difference between the hire reserved in the charter and the hire necessary to secure such another bottom. No one disputes this, but it is a part of the rule that the substitute must be equal to the ship withdrawn, and the libelants assumed the burden of showing that there were none such. This they did show. It appeared that there were obtainable no charters which would permit the carriage of benzol or other such products. This proof the respondents did not meet. There remained only those ships which the libelants already had under charter, the Sibiria, the Liberia, the Sarnia, and the Zealandia. The Liberia was off the coast of Africa, without coal and unable to move. The Sibiria, though her charter allowed her to carry petroleum and its products, which would include benzol and toluol, was bound east on her last voyage. The Sarnia, with a charter to Lisbon, was not available, as she could not be taken to the Mediterranean; the same was true of the Urna. There remained available only the Zealandia, which was owned by the libelants, and which they tried to substitute, with what results will appear later. It is reasonably certain, therefore, that the usual rule of damages does not apply, and that the charterer's lost profits are the true measure of damages under certain limitation to be considered.

However, a distinction must be taken. The actual profits arising from the charterer's subcontracts are not the subject of recovery in a case like this. Profits upon subcontracts are not within the consequences with which the law charges one who breaks a contract, unless, when the contract is made, he has been advised of their actual, or proposed, existence. Masterton v. Brooklyn, 7 Hill (N. Y.) 61, 42 Am. Dec. 38. In so far, therefore, as the actual contracts of freight which the libelants procured were beyond what were usual at that time and place, they could not recover. Thus, while the loss of those profits was the true measure of the charterer's actual loss, it was not the measure of damages, which, on the contrary, were limited to the reasonable profits of such a voyage under those circumstances.

But if in fact the actual profits lost are less, or no more than, the probable profits of such a voyage, this distinction does not apply. Now

the actual profits, making every allowance which the libelants show themselves to have lost through the delay, amount to no more than $167,000, and the allowance made them is $176,000. The allowance is in fact made upon the basis of what the Ada would have earned upon certain suppositions, and these suppositions do not distinguish this voyage from what was to be expected at that time and place. Therefore the award itself is no greater than what should reasonably have been anticipated.

The profits of the supposed cargo of the Ada were all tabulated in Exhibit 41, which professed to be a kind of manifest with the freight values extended. The total of this manifest, after clerical deductions of $3,541.25 were subtracted, came to $238,522.81. In making it up, some of the quantities were necessarily estimated, and, as there was no way of correcting the estimates, I think they must be accepted. There are no doubt chances of error in this, but it is one of the chances inherent in testimony. In respect, however, of the more valuable part of the cargo, benzol, we have a means of checking the calculations, because we may assume that the weight measure of benzol in all drums but Stewart's shipments was about 1,000 lbs., or forty-five hundredths of a ton, and that it measured about 24 cubic feet. It is true that Boulton's weight figure is thirty-eight hundredths, but Erickson's should be preferred.

However, before making these corrections, it is necessary to eliminate certain of the items altogether. Thus it is conceded that, upon Exhibit 41, the seventh item, 150 drums of benzol, is duplicated in the thirty-second item, which is $6,750. It is also apparent that the fifteenth item, 420 drums of benzol, is also duplicated in the thirty-fifth item; this results in a further deduction of $18,750. Further, it is proved beyond doubt that the twenty-ninth item should be 100 drums, not tons, which would, at $2 a pound, be worth $4,800, resulting in a further deduction of $7,200. Finally, there is a very serious doubt about the last item of 600 drums from L. H. Stewart. There seems to be no question from Karminski's testimony that 370 drums were all that the Carbolite Chemical Company ever ordered Stewart to ship. As to 230 drums the consignment was, therefore, on Stewart's authority alone. Of course, he could have been held liable in law; but it seems to me rather absurd to suppose that this would ever have been done, or that so much of it should count as freight which would actually have materialized. I shall eliminate so much of this freight, $11,040. The total of these is $43,740. Finally, in calculating item No. 19 on the basis of forty-five hundredths tons of benzol to the drum and 24 feet, we get a further deduction of $946; a similar treatment of item No. 34 results in a deduction of $960—a total of $1,900.

We therefore start with a corrected manifest of $190,882.81. But this sum does not represent any cargo that the Ada could ever have carried, because she only arrived on April 22d, and could not have sailed before April 30th. Two of the contracts were canceled for this delay, and for that alone—item 1, on Exhibit 41, or $1,000, and item 17, of $22,800. Whether the other contracts, nearly all of which could have been also canceled for delay, would have remained uncanceled, no

one can say. If they all did, $167,000 was the sum of the cargo which the Ada would have carried, unless the libelants could have got more freight than they did between April 7th and April 30th. Six of the 40 items on Exhibit 41 were booked on or after April 7, but they were not very large—except item 38, which appears to have been procured while the shipper was in ignorance of the withdrawal. The extent to which the libelants during that period would have got more cargo is therefore an open factor, just as the extent of cancellations for delay. This must rest in speculation.

Erickson swore that there was enough cargo offering to fill two such ships, and no witness contradicts him. However, it is only an estimate, and that of a hostile witness. The other sailings thereabouts hardly bear him out. The Asahi Maru carried 3,000 tons in March, of which 750 was benzol. She refused 300 or 400 drums, amounting to say 150 tons, which would have added $30 a ton to the freight substituted for it, and would have brought her total earnings to $203,000. The carrying capacity of the Ada, whose dead weight was 3,350 to 3,450, appears, from the earlier voyage and the bookings on this, to have been 2,800 or 2,900 tons. At that rate she might have earned $196,000 or $190,000 on this voyage.

The Sibiria carried 600 tons of benzol, and after she was lightened she earned $125,000. Before being lightened, she would have earned $148,000. Her capacity was greater than the Ada's. The Zealandia and the Sarnia each left light, because, as the libelants say, of the injury to their good name. I shall, in view of the record, leave them out of account. The Sammanger, of the respondents, with a cargo of over 5,000 tons (measurement), bound for Genoa and carrying benzol, earned gross $219,000.

All this evidence should, in my judgment, have some effect upon whether the Ada could have booked more freight than she did, but for the withdrawal. We are certainly not absolutely bound by the estimates of experts, even though they be not contradicted. Taking it into consideration, I think I shall not accept Erickson's estimate, but figure the freight in this way: The greater part of the bookings were made on or before April 7th, as I have said; only about $15,000 were made thereafter. All but a single one of these bookings were for sailings between April 5th and April 15th, and at the time they were made the Ada was supposed to be sailing at the sailing dates given in them. If the libelants are not content to accept as the limit of their cargo so much as remained on April 30th, when the Ada could in fact have sailed, because of the supposed change in their position after April 7th, they must certainly be content to accept that part of the total period before the notice of withdrawal became public. The one certainly inaccurate way of calculating this voyage is to take the whole of the month, in the face of the absolute proof that they could not hold the whole of their freight through that month. While it is an assumption to take any less period than the whole month, nevertheless it is an assumption of which the libelants cannot complain to suppose that the profits would have been the same, but for the withdrawal, as they would have been if the Ada had sailed on the 15th. We must,

even then, to reach the result that I shall, assume that, had she arrived on the 5th, there would have been no cancellations, which we do not know. The assumption so made is that the latter half of April would have been as good as the earlier half.

Making the assumption just stated while we allow all the bookings for a sailing before the 15th, we must eliminate item 24, made on the 14th for a sailing on the 22d, and item 38, for a sailing on the 27th, together with two other small items, which bring the total up to $15,-000. The result of this is to assume that the cargo would have been worth $176,000. This includes the transfers from the Lady of Gaspe, which seem to me reasonably to be included.

It may, however, be urged in reply that to reason so is to ignore that between the 7th and the 15th the libelants were under the putative odium of the withdrawal, and that in that period they might have added to this cargo. This is, however, incorrect, because, of all the contracts in evidence, only one (item 26) had a sailing date less than 7 days after the booking, and that has 5 days. Obviously, then, there could have been no bookings, or substantially none, made after the 7th for the 15th.

Thus, making all the most favorable assumptions for the libelants, it seems to me obvious that we should not take their actual loss at more than $176,000, and I feel free, in view of this analysis and of the similar cargo for nearby sailings, to disregard Erickson's conclusion as less reliable evidence, notwithstanding the commissioner's acceptance of it.

This sum, however, I accept as the reasonable value of the cargo, although it is the full measure of the libelants' proven loss. There is no deduction necessary, in my judgment, under the rule of law with which I started. On the contrary, I think that the freights obtained by the libelants were no greater than any one ought to have expected at that time and place. The only single windfall or bonanza which might be open to question was the shipment of 275 tons of explosives; but it hardly needs argument that this was to be expected in such a bottom and at such a time. Therefore I find that the gross profits of the outward voyage would have been $176,000.

The next question is of the deductions to be made from this sum, which the libelants concede to be $76,500. Of these $3,500 were for port charges in and out of New York, $5,000 in Genoa, and $6,500 freight commissions and incidental expenses. It is urged that some of these, at least, should be prorated against the return freights. I do not understand, however, that these charges bore any relation to the amount of freight on the return voyage. They would have existed, no matter what the return freight was. It is true that the last item, $6,500, might vary with the return cargo; but no one can say from the record to what extent. The whole matter, therefore, turns upon whether there is any basis for an allowance for inward freight.

*The Future Return Voyage from Genoa.* There is no evidence of the inward freights, except F. Frankel's estimate that it would result in a gross return of $15,000, equal to the first voyage. The witness

supposed that $7,500 of freight was due at New York, though the account subsequently disclosed nearly $11,000. It seems, therefore, that the libelants had already collected at Genoa and Leghorn $7,500, and that the gross freight on that voyage was $18,500. I can scarcely make such an inference, however, without more basis, considering the power of the libelants to produce the exact facts. Assuming that the inward voyage netted $11,000, have we any ground for accepting F. Frankel's estimate that the next would have done so? Taken merely as an estimate, it seems to me clear that we have not. The witness made no attempt to show that he knew the values or conditions at Genoa. Yet the testimony, which might have been justified by adequate information, was not objected to, so far as I can find, and the libelants had good reason to suppose that it would not be challenged. Whether they could have supported it no one can tell, but they should have been advised that the respondents would insist that it was insufficient. That the ship would have earned some freight was practically certain. The amount would in any case necessarily have been an estimate, and there was at least some basis for supposing that the earlier voyage was an indication of what it would have been. When Frankel made that estimate, he testified to an opinion which, being possibly competent, should stand while unchallenged. I allow $11,000 for the inward voyage.

[2] *The Loss on the Zealandia.* This item arises in the following way. When the Ada was withdrawn, the libelants, finding themselves committed to various shippers for cargo to be shipped on the Ada, substituted the Zealandia in her stead. They succeeded badly, owing to the irritation of the shippers at being misled about the Ada. In consequence, the Zealandia was not filled, and earned a gross freight of $90,766.01, as against a freight of $125,000, which she could have earned upon the carriage of oil. As to this contract with the Standard Oil Company, though it was never reduced to writing, I think it sufficiently proved, and I shall assume that, had she not been withdrawn, she would have earned that sum gross.

As I have already indicated, it presses my credulity hard, especially in view of Herrmann's and Nichols' testimony, to suppose that, in such dearth of shipping as existed, the mere withdrawal of the Ada without any fault of the charterers should so have affected their power to fill the Zealandia; but the proof stands uncontradicted, with the exception of the witnesses just mentioned, that the cancellations were because of the withdrawal. Moreover, there would apparently have been no trouble on the face of it in calling those shippers who canceled to see whether any effort was made to secure them for the Zealandia, and why they refused. Upon such a record, whatever I may suspect, I do not feel at liberty to disregard proof which the commissioner has accepted. I shall therefore assume that the Zealandia was not filled because of the Ada's withdrawal.

The libelants support the claim to damages upon the theory that it was a necessary consequence of their effort to minimize damages. They say that they were suddenly faced with the necessity of saving, if they could, $190,000 and more of freights, and that it was prudent to sacri-

fice $125,000 to do so; indeed, it was even their duty to do so. Suppose, they assert, they had left the Zealandia idle at the wharf; suppose her freight had been only $10,000 or $50,000—could they have hesitated for a moment to take a chance? This, as a mere statement of the law applicable, is true enough; but it is clear, I think, that it has no relation to the facts. Not every effort to minimize the damages will serve, especially when it results in enhancing them. If the libelants here meant to surrender such a substantial advantage as the charter with the Standard Oil Company, they were bound to look before they leaped. Boulton says that he told all his shippers on April 7th or April 8th of the withdrawal, and while we know that this is not true, there is no excuse if he did not. In most cases it was possible to learn within a week whether they would transfer to the Zealandia or not. At least it was possible to learn whether enough would do so to sacrifice such a cargo as was already promised to her. There is no suggestion that the libelants were faced with a sudden choice, and had to decide whether or not to throw up the oil cargo before they could communicate with their shippers; yet that is the only situation which by any possibility could have justified fixing themselves with so large a loss. If they were actuated by other purposes, that is, to see that the Ada's shippers got carriage, cost what it may, that was not an effort to reduce damages, and the respondents are not responsible. They cannot be held because the relations between their charterer and his customers were such that he must sacrifice his immediate pecuniary interests to a continuance of friendship between them. Only in case the action was a fair exercise of judgment to make damages small can it be supported; it has not been shown to be that, and it is in my judgment too remote to constitute damages.

*The Sarnia and the General Damages.* In view of what has just been said, it is hardly necessary to add anything more in defense of the commissioner's ruling touching the loss of freight on the Sarnia and that most vague and speculative claim for general damages.

*The Net Freight Inward.* This item depends wholly upon the proper credits in the account. They are very numerous and very troublesome. All the disbursements were made, and were reasonable in amount, and the sole issue is of their necessity. The libelants insist that, if they had had the Ada, only a small part would have been incurred.

The first seven items are for Brenack's charges and of these Nos. 1, 4, and 6 are all included in the proper allowance for wharfage and discharge if the libelants had had the Ada, to be considered later; Nos. 2 and 3 were for labor in lightering, and depend for their necessity upon whether the libelants could have used Marten's wharf, as they had the right to do under their contract. Brenack says they could not, because it was too crowded; but Dinsmore, who was in charge, says that the ship could have been accommodated. The commissioner was right to believe him. All charges, therefore, occasioned by the change of the cargo to the Brooklyn pier, are on the respondents' account. Therefore I follow the commissioner, and disallow items 1, 2, 3, 4, and 6.

239 F.—24

I allow of Dalzell's charges, instead of $60, $195, because I include towing to and from Robbins' dock. The rest seems to have arisen from the lighterage.

Of Perry, Ryer & Co.'s charges, items 10, 11, and 12, I allow, like the commissioner, $106.74; the rest was incidental to the lighterage.

The coal consumed at the wharf of Brady Bros., item 13, should be allowed at $3.50, and comes to $126. Item 14 is allowed at $8.40. I follow the commissioner.

The Journal of Commerce item is disallowed.

Nos. 17, 18, 19, and 20 do not appear to have been necessary; they are disallowed.

The sawdust charge I allow, but not the J. C. Muller charges, which I cannot find the reason for.

The coal at Bermuda would have cost $1,500. I follow the commissioner.

The protest charge I allow.

Item 25 I disallow.

It does not appear, from Barranco's testimony, that the double moving increased the cooperage charges. I allow them in full.

I disallow Stapleton's and allow Hennessey's charges.

I disallow item 30.

Items 32, 33, and 34 were incurred only because the Ada was at Brady's pier. I disallow them.

Items 35, 36, and 37 of Holz for wharfage and clerk hire must be considered as included in the credit to be given to the Ada for the putative costs of her wharfage and discharge, had the libelants had her. They are not allowable here.

The hire of lighters would not have been incurred. I disallow them.

The surveyor's charges, item 40, I suppose to be a part of the repairs, though I have not found mention of it in the record. In the absence of more evidence in regard to them I must disallow them.

The final question is of repairs, which were actually made to the extent of $9,000 and more. The libelants' liability to pay for these rests upon the charter, which provided that the owner should put the ship in seaworthy condition on delivery and the libelants should keep her so. When the respondents came to put in this item, they called Taylor, who took charge of jobs in the machine division of the dry dockers. He swore that the work was all ordered either by the chief engineer or the chief officer and captain. He then said that it was all necessary to make the ship seaworthy. Upon his recross-examination he certainly gave evidence, qualifying his first statement, which I read as meaning that the only necessary parts were the railings, the steering engine, the anchor windlass, the propeller and tail shaft, rewooding, new bolts, bush rewooded, and new wheel fittings; but he could not say how much of the whole this represented. On redirect examination the respondent tried to get him to go over the bill again, and probably to qualify his testimony by saying what other work was necessary to make the ship seaworthy. The commissioner refused to allow this inquiry, for certainly the most extraordinary reason, that it involved a cross-examination of one's own witness. The witness had

first said that all the repairs were necessary, and then that all were not, and it was so obviously fair to allow the contradiction to be cleared up that I cannot permit the matter to stand there. The respondents, unless the libelants concede the bill for repairs, may complete their proof upon this point before me. I am very far from satisfied that all the repairs were not necessary.

As to Judge Smith's order, it was irrelevant to the question. It is, of course, true that it limited the repairs to be done at that time, and apparently it was violated; but the order, had it tried to fix the repairs, except for the purposes of the attachment, would have been quite outside the powers of the court, since the cause was not then being heard on the pleadings. It was merely an interlocutory proceeding to limit the maritime liens which might embarrass the attachment. It would be extremely unjust to throw out $9,000 from the account on any such procedural point as the supposed impropriety of cross-examining one's own witness. After some experience in trials, I think I can say that I have never seen a case where the objection made for justice, unless a willing witness was being led. This item cannot, therefore, be disposed of upon the present record.

There is an added claim for the cost of watchmen. The Martens contract provided for one in the day and one at night, to be charged extra, the libelants to employ any more they needed. Kerwin says one was necessary at each hatch and two on the dock, and I find no contradiction of it. I shall allow one at each hatch, two on the dock in the day and one at night, seven in all, $14 a day. For 12 days this would be $168. The rest was caused by the lighters, or was unjustified.

Some credit must, of course, be allowed the Ada for what the libelants would have paid for wharfage and discharge. This rests on Boulton's testimony, which the commissioner accepted, and which, not being contradicted, I must accept also. The only point of doubt is whether to allow $125 or $100 a day. The modification in the contract Boulton swore to before Dinsmore was called, and he was not asked about it. I have no alternative but to accept it. Therefore I follow the commissioner in respect of these credits.

*Incidental Items.* The charges for the chronometer and the ice chest are certainly allowable, being part of the charter itself. There is scarcely any evidence regarding the payment of $500 to the master, except the testimony of Frankel barely that he advanced it. The charterers were to pay $3,000 a month, and, as I understand it, they did pay it in addition. The advance, therefore, was not part of this engagement, and is properly chargeable on account of the respondents. The item for lumber is somewhat speculative, it is true; but there is probability that it was in part used to fire the ship into Gibralter. The captain decided what coal should be taken on board at Baltimore, not the libelants. If the lumber was used as dunnage for the marble, it is on the account of the respondents. Having shown the lumber to have come to the respondents' possession, or some of it, anyway, it is on them to account for it, which they have not done. I accept the commissioner's allowance.

*The Payments of Hire under the Charter.* Both sides concede that the installment of $45,000, payable in April, must be set off against the recovery; a question arises about the last payment of $30,000, which the libelants rightly insist was conditional upon the delivery of the bill of sale. The charter was somewhat singular, in that the charterer, in consideration of the "hire," was not only to have possession of the ship, but a bill of sale on the last payment. This proceeding was brought originally to recover for the breach of the promise to let and for the anticipatory breach of the promise to deliver the bill of sale. Judge Smith, for reasons of jurisdiction, in effect severed the two causes of action, and that upon the anticipatory breach is now pending in this court at law. The possession of the vessel and the right to the profits from her were not conditional upon the final payment. This would, perhaps, not be relevant if the period had passed when the final payment must have been made, provided that it was unconditional. Since, however, the promise to make that payment was conditional upon the promise to deliver the bill of sale, anything which defeated the latter will defeat the former. Until it is determined that the promise to deliver the bill of sale is enforceable, it would be obviously unjust to enforce the promise to make the last payment, which was a part of the purchase price as well as "hire." The payment will not be charged in the account.

[3] *Interest.* The commissioner has not awarded any interest on the award for profits on the outward voyage, probably because the damages were unliquidated. At law in this circuit interest on such a claim as this, subject to set-offs, is not allowable. Stephens v. Phœnix Bridge Co., 139 Fed. 248, 71 C. C. A. 374. In equity (Pennsylvania Steel Co. v. N. Y. City Ry. Co., 198 Fed. 778, 117 C. C. A. 560) and in admiralty (Merritt & Chapman Derrick & Wrecking Co. v. Morris & Cummings Dredging Co., 137 Fed. 780, 70 C. C. A. 356) the matter lies in discretion. The last case was like that at bar in two respects, first, the presence of unwarranted claims, e. g., for the Sarnia and the general damages; and, second, in the large deductions that have been made in this court. Moreover, in so far as the rule depends, as it does somewhat, upon there being some sum which the person liable may tender, it is quite clear that no interest should have been awarded. I follow the commissioner in the exercise of his discretion. However, no interest should be credited to the Ada upon the payment of $45,000, as that, properly considered, is only an item in the account.

As a result no interest will be allowed until the date of the decree.

As respects costs the libelants will have a docket fee, and disbursements up to the interlocutory decree; thereafter, in view of the qualified outcome of the reference, each party will bear his own costs, and the commissioner's fee and the stenographer's charges will be borne equally.

My finding regarding the repairs prevents any decree from being entered, until that matter has been heard. I can take it up during the week of January 2, 1917.