ATLANTIC LINES, LTD., and Chester, Blackburn & Roder, Inc., of New York, Plaintiffs-Appellees-Cross Appellants,

v.

NARWHAL, LTD., and R. B. Kirkconnell & Bros., Ltd., et al., Defendants-Appellants-Cross Appellees.

CHESTER, BLACKBURN & RODER, INC., OF FLORIDA, Plaintiffs-Appellees-Cross Appellants,

v.

NARWHAL, LTD., and R. B. Kirkconnell & Bros., Ltd., Defendants-Appellants-Cross Appellees.

No. 73–3460.

United States Court of Appeals, Fifth Circuit.

June 16, 1975.

Richard F. Ralph, Miami, Fla., for Narwhal, Ltd.

G. Morton Good, Miami, Fla., for Atlantic Lines and others.

Appeals from the United States District Court for the Southern District of Florida.

Before TUTTLE, THORNBERRY and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

This consolidated appeal arises from two related civil suits resting on admiralty and maritime jurisdiction seeking damages for an allegedly wrongful and premature termination of a charter party agreement in the course of a sale of the Motor Vessel Jamaican Provider. Narwhal, Ltd. (Narwhal), a Bahamian corporation and original owner of the vessel, and R. B. Kirkconnell & Bro., Ltd. (Kirkconnell), a Caymanian corporation and purchaser of the vessel were named respondents in both suits.

The first suit was filed by Atlantic Lines, Ltd. (Atlantic), a Bahamian corporation which chartered the vessel, and Chester, Blackburn & Roder, Inc. (CBR–NY), a New York corporation which acted as charter broker and agent of Atlantic. Atlantic sought damages for lost profits and CBR–NY sought recovery for lost brokerage commissions.[1]

In the second suit, Chester, Blackburn & Roder, Inc., a Florida corporation (CBR–MI) doing business as a steamship agency and port agent, Marine Terminals, Inc., (Marine), a stevedoring concern incorporated in Florida, and Pan American Mail Lines, Inc. (Pan Am), a Panamanian corporation and ocean carrier of cargo claimed damages as third party beneficiaries of the charter party.

We pretermit a recounting of the tortuous procedural history of this case in the courts below as unnecessary to an understanding and resolution of the issues before us, and herein treat the appeal as arising out of a single suit by five libellants.

The district court[2] held that Kirkconnell did not commit actionable fraud or tortiously interfere with a contractual relationship and entered a judgment in its favor. It ruled, however, that Narwhal breached the charter party agreement and awarded damages to Atlantic and CBR–NY. The three parties claiming damages as third party beneficiaries,

---

1. Libellants dismissed with prejudice prior to trial an additional count alleging breach of an agreement not to sell to a competitor.

2. The matter was handled below in piece-meal fashion by three district judges of the Southern District of Florida. Judge Cabot had initial responsibility for the case and determined the issue of Narwhal's liability to Atlantic and CBR–NY but died suddenly soon thereafter. Judge Choate entered judgment against Narwhal after the death of Judge Cabot. Judge Roettger was appointed to succeed Judge Cabot and the cases were reassigned to him. He determined the issue of Kirkconnell's liability, the issues under the third party beneficiary complaint, and computed damages.

Marine, Pan Am, and CBR–MI were denied relief for failure to show the existence of liability or compensable damages.

Atlantic appeals, contending that an incorrect measure of damages has been applied. CBR–MI, Marine, and Pan Am challenge the dismissal of their suit. All libellants appeal the judgment in favor of Kirkconnell. Narwhal seeks reversal of the finding of wrongful termination; and Kirkconnell appeals protectively. Because the district court erroneously concluded as a matter of law that the charter party could be terminated only by a consummated sale, we vacate and remand for further proceedings.

The following facts, as found by the district court or not in dispute, bear on the issue of breach of charter. At all material times Sir Roland Symonette was the principal of Narwhal. Because of poor health he was unable to supervise his shipping interests and had been advised by his physician to dispose of them. Accordingly he was anxious to sell the Jamaican Provider. Several factors, however, militated against a speedy and outright sale.

The vessel had been built in Germany under a subsidy program sponsored by the German government to promote its shipping industry. She was heavily mortgaged. Because of a mortgage provision allowing the German bank administering the mortgages to call the loans if the Jamaican Provider was sold without their consent, Narwhal needed such consent to make a binding sale. Because of the government subsidy, the mortgages were issued at a desirable rate of interest, unattainable in the open market. Any purchaser who was unwilling or unable to pay the $1,750,000 purchase price in cash would have to obtain the bank's consent in order to assume the favorable mortgages. Finally, as a personal guarantor Sir Roland wished to be relieved of his guaranty in the event of assumption of the mortgage obligation by a purchaser.

While he wanted to sell the vessel as soon as possible, Sir Roland agreed to charter it to Atlantic as an interim measure until he could find a purchaser and be relieved of his guaranty. He insisted upon a cancellation clause in the charter party to leave him free to accomplish this end.

Atlantic at this time was interested in developing a new trade between Miami and the Virgin Islands. Charter of the Jamaican Provider, a "roll on/roll off" ship equipped to receive trailers on wheels and not simply cargo containers would be advantageous to generating this trade. Atlantic had an obvious interest in protecting its investment in development of this trade by a guarantee against bad faith cancellation. Further, in the event of termination of the charter, Atlantic needed assurance of sufficient time either to wind down operations and fulfill commitments or to find replacement tonnage.

CBR–NY, acting as agent of Atlantic, drew up a charter party agreement dated May 15, 1969, containing the cancellation clause which forms the focal point of dispute. The demise was for a period of 13 months with charterer's option to extend to two years, but with the following proviso:

> In the event Owners sell the vessel, Owners have the option of cancelling this Charter Party on giving Charterers minimum three (3) months notice of such definite sale. Redelivery otherwise as per Charter Party.

This cancellation clause was intended to give Sir Roland the flexibility he needed in order to sell the vessel while the three month term was intended to allow Atlantic time to fulfill commitments and arrange for replacement tonnage.[3]

In January 1970, Narwhal and Kirkconnell began negotiations for sale of the vessel to Kirkconnell. Sir Roland made clear his desire to be relieved of his guaranty and his insistence upon the German bankers' consent to a transfer of the mortgages. Kirkconnell was in accord, as it wished to assume the mortgages at the favorably low interest rate.

---

**3.** Suit was filed, of course, because of the unavailability of satisfactory replacement tonnage.

After Kirkconnell received assurances from its bankers of aid in financing the purchase, an oral agreement of sale was made, subject to the German bank's approval of the sale, transfer of the mortgage, and release of Sir Roland.[4] Two short telegrams were exchanged immediately thereafter, confirming this agreement. It is unclear from the record whether agreement was in fact reached and evidenced by these telegrams, or whether material negotiations continued up to the time of notice of termination. In any event, steps were then undertaken to begin what turned out to be a protracted process of obtaining approval and transfer of the mortgage.[5]

On March 12, 1970, after Sir Roland had received a guarantee of financial responsibility from Kirkconnell's bankers and a $50,000 deposit, Narwhal gave Atlantic a formal, written notice of termination. The German bankers, on April 24, 1970, agreed to substitute Kirkconnell on the mortgage provided certain conditions were met.

Atlantic redelivered the vessel on June 12, 1970. Kirk Express Co., Ltd., Kirkconnell's nominee, thereupon went into possession. Because of various formalities concerning the transfer of title on the Bahamian registry, however, a formal transfer of title did not take place. In its stead, two written agreements were executed June 10, 1970. Narwhal and Kirkconnell executed a three-party document which formally set out the terms of their agreement. The German bank, the intended third party signatory, did not sign. Narwhal and Kirkconnell also entered into a bareboat charter for the Jamiacan Provider, with the hire fixed in an amount equal to the carrying costs of the vessel. All payments under the charter were to apply to the purchase price.

Formal closing did not occur until January 20, 1971, seven months after the vessel's redelivery.

The Atlantic group alleges that the charter party was wrongfully and prematurely terminated because Narwhal had not "definitely sold" the vessel, either at the time of notice or at the time of redelivery, defining "definite sale" as a consummated sale, with all formalities completed and title transferred. It argues, in the alternative, that if "definite sale" is defined as a "binding contract of sale", then no binding contract was ever entered into because (1) only an oral agreement was in existence at the time of notice; (2) prior to the expiration of the three month notice period, only two parties signed the formal document agreeing to a sale; and (3) the oral and written agreements, in any event, were always subject to the consent of the German bankers, third parties over whom Narwhal and Kirkconnell had no control, which at all times up to January 20, 1971, the actual date of closing, was contingent upon the fulfillment of more than technical details. The essence of this last argument is that, until consent was unconditionally given, there could not be a binding contract of sale because neither party could enforce it. It regards the bareboat charter of June 10 as a direct violation of its charter party, cancellable only "in the event of sale".

Respondents assert that "definite sale" means only that a binding and legally enforceable contract of sale must be entered into at some point prior to termination of the three month notice period. They contend that there was such a contract, based on the German bankers' consent, which was given April 24, 1970, before the end of the three months' notice period. They view the bareboat charter as a charter in name only, and in

---

4. Narwhal and Kirkconnell contended that at this time, and reaffirmed subsequently, Sir Roland orally promised to pay off the German mortgages and give Kirkconnell a purchase money mortgage in the event the German bankers refused consent to a transfer. Much time during trial was devoted to proving this oral agreement and to arguing its validity,

which, of course, libellants challenged. This issue, never reached by the trial court, will remain open for consideration on remand.

5. The language barrier, distance, and technical details of transfer of the mortgage and of the registry from Nassau to Grand Cayman were substantial factors in the delay.

reality an accommodation of the purchase agreement. They also urge the existence and validity of the oral agreement pursuant to which Sir Roland was to pay off the mortgage and give Kirkconnell a purchase money mortgage.

The district judge, while determining that the cancellation clause was "to some extent ambiguous", indicated that the legal distinction between a "sale" and a "contract of sale" could not be disregarded and ruled that "definite sale" meant a consummated sale as a matter of law. He viewed the cancellation clause as ambiguous primarily with regard to the point in time at which the consummated sale had to occur. He considered parol evidence, therefore, in order to determine whether the parties intended the consummated sale to occur prior to notice or prior to redelivery. On the basis of the evidence adduced, he held that it had to occur by the end of the three month notice period. Because transfer of title did not occur until January 20, 1971, 222 days after the end of the notice period, he found that Narwhal breached the charter party for such time.

■ Under long-recognized, albeit strongly criticised contract principles, parol evidence is inadmissible where the language of a contract is clear and unambiguous. See Corbin, on Contracts, Sec. 542. If the language is ambiguous, however, extrinsic evidence is admissible to prove the parties' intention at the time of contracting. *Ibid.*

We conclude that the district court was in error in ruling that the words "definite sale" mean a consummated sale as a matter of law, and further that the difference between a "sale" and a "contract of sale" may not be disregarded. The fact that the parties recognized at trial that there exists a distinction between a binding contract of sale and a completed sale does not mean that they incorporated this distinction into their agreement as a matter of law. The phrase is not one of art and has no fixed and invariable meaning. Rather, its meaning alters with the context and intention of the parties, as attested by numerous cases construing cancellation clauses in leases. See Cincinnati-Louisville Theater Co. v. Masonic Widows' and Orphans' Home and Infirmary, 6 Cir. 1921, 272 F. 637; West v. Brenner, 1964, 88 Idaho 44, 396 P.2d 115; Middleton Restaurant Enterprises v. Tovrea Land and Cattle Co., 1961, 89 Ariz. 316, 361 P.2d 930; Curtis Inn v. Pratte, 1947, 94 N.H. 380, 54 A.2d 357; Travelers Insurance Co. v. Gibson, Commission of Appeals of Texas 1939, 133 Tex. 534, 130 S.W.2d 1026; Annotation, Construction of Provision for Termination of Lease in Event of Sale of Property, 35 A.L.R. 518, 538–40. In each of these cases, the court recognized either that the word "sale" was ambiguous and depended upon proof of surrounding circumstances to arrive at a meaning, or ruled as a matter of law that it was satisfied by an executory contract of sale.

The district court, therefore, was in error in failing to consider extrinsic evidence in interpreting the meaning of "definite sale". We therefore vacate and remand with directions to the district judge to determine upon the present record and upon additional testimony, if found necessary, the intent of the parties as to the meaning of "sale" at the time of entering into the charter party, free from the strictures under which he initially labored.[6]

■ In determining the meaning of "sale", the court should give special consideration to the purposes of the contracting parties in inserting the cancellation clause. Although the record shows the parties' awareness of the technical distinction between an executed and an

---

**6.** There was an earlier but abortive attempt at sale of the vessel on October 31, 1969 to an Italian group. The precise nature of the agreement for sale was not made clear at trial. Since this incident bears only peripherally (if at all) upon the issues on appeal, we will not further allude to it.

Upon remand, the parties should be permitted to develop the circumstances of this matter fully, as it may shed light upon the intent of the parties to the charter party.

executory contract of sale, this does not resolve the question whether they in fact intended this distinction to control. The court should determine whether the parties, in framing the termination clause, were contracting as to the time of passage of title "in the event of sale", evidencing concern that transfer of possession could only be accomplished by means of an executed sale, or whether their concern was merely with transfer of possession of the vessel, creating a means by which a purchaser could demand possession at the end of a reasonable notice period. See Travelers Insurance Co. v. Gibson, 130 S.W.2d at 1028; Middleton Restaurant Enterprises v. Tovrea Land and Cattle Co., supra; West v. Brenner, supra.

Should the court on remand find that a completed sale was not necessary to terminate the charter, it must decide whether a binding contract of sale was sufficient, and if so, at what point in time such a contract had to be entered into, whether before notice or at some point prior to termination. Further, if a binding contract of sale was sufficient, the court and the parties must address the question of what law controls whether and when Narwhal and Kirkconnell negotiated a binding contract of sale, a question ignored during trial and on appeal.

■ While the interpretation and construction of the charter party is governed by federal law, Richard Bertram & Co. v. The Yacht, Wanda, 5 Cir. 1971, 447 F.2d 966; Flota Maritima Browning De Cuba, Sociadad Anonima v. Snobl, 4 Cir. 1966, 363 F.2d 733, cert. denied, 385 U.S. 837, 87 S.Ct. 82, 17 L.Ed.2d 71, admiralty jurisdiction does not extend to contracts for the sale of a vessel. Richard Bertram & Co. v. The Yacht, Wanda, supra; Flota Maritima Browning De Cuba, Sociadad Anonima v. Snobl, supra. Consequently, it appears reasonable to assume that the signatories to the charter party did not intend that admiralty

principles would control the validity of a contract of sale rendering the cancellation clause operative. Instead their intention was more probably to be governed by the law of the jurisdiction invoked by either party seeking to enforce the contract of sale. Since there were no United States contacts calling any domestic laws into play,[7] we anticipate that the district court, if the issue must be resolved, will ascertain the controlling principles of foreign law so that the case may finally be determined according to the laws actually governing the parties' actions.[8]

The parties present three other issues on appeal. The district court's failure to set out its factual findings in greater detail or to indicate what it determined the controlling law to be prevents effective review of two of these issues at this time.

Pan Am, CBR–MI, and Marine claimed damages as third party beneficiaries. They alleged that all five libellants, through common stock ownership and control, operate as an integrated shipping complex, with corresponding financial benefits, of which Sir Roland was aware. They contend that the charter hire was higher than it would have been otherwise solely because of anticipated financial benefits flowing from intercompany dealings. With reference to their complaint, the court found only

> that the entities shifted charters from the name of Atlantic to Pan American Mail Lines and back as it suited the interest of the various plaintiffs but that there has been no showing of liability or compensable damages suffered.

■ All libellants brought a claim against Kirkconnell for fraud, contending that Kirkconnell represented that the vessel was in fact sold when it was not, and for tortious interference with a contractual relationship, with no inquiry as to the rights of Atlantic ever under-

---

**7.** The vessel was of Bahamian registry. The contract was negotiated while Sir Roland was in the Bahamas and the Kirkconnells in either Jamaica or Grand Cayman.

**8.** This applies both to the agreement pursuant to which the vessel was actually sold and the purported oral agreement to give a purchase money mortgage.

taken. The lower court specifically found that Kirkconnell was acting in good faith, a finding with ample support in the record. It concluded that

there has been no showing of fraud or tortious interference with a contractual relationship or sufficient evidence to support any other theory of liability to justify a recovery by any of the plaintiffs against Kirkconnell.

These meager statements and unrevealing conclusions without citation provide an inadequate basis for review. We cannot determine if the court addressed the issues of what law—state, foreign, or admiralty—should govern who may recover for breach of the charter party and who may be held responsible, nor do we know what law was actually applied. Without more detailed undergirding factual findings, obviously we cannot review the adequacy of the factual support for the decision. In sum, without more, we cannot determine whether the correct law was correctly applied to facts supported by the evidence. On remand, if the district court again finds Narwhal to have breached the charter, it is directed to expand upon its findings and conclusions on the third party complaint and the liability of Kirkconnell and to indicate the law relied upon so that this court may adequately review its judgment.

The final issue, pressed by Atlantic, raises a challenge to the measure of damages awarded by the district court. We offer the following as guidance on remand in the event the district court once again reaches this issue. We emphasize that the following observations are predicated upon a renewed finding that Atlantic is entitled to damages for the 222 day period between turnover and January 20, 1971.

In 1966, long prior to chartering the Jamaican Provider, Atlantic had arranged for the 1970 delivery of the M/V

Pan Carib, which it then intended to subcharter. On its fortuitous delivery shortly after the Jamaican Provider's withdrawal, Atlantic decided instead to use the Pan Carib on the Jamaican Provider's run after efforts to find a replacement vessel failed. The Pan Carib, however, was a smaller vessel unable to transport the profitable large containers and hence was not as successful as the Jamaican Provider. Far from earning its projected $94,350 net for subcharter, and far from earning close to the Jamaican Provider's projected profit figure of $112,325.51 on the same run, it earned only $17,394.89 net from June 12, 1970 to January 20, 1971, the period of claimed premature termination.

The district court concluded that Atlantic was entitled to $112,325.51 damages for lost profits it reasonably could have expected to earn but for wrongful withdrawal for 222 days. See Polar Steamship Corp. v. Inland Overseas Steamship Corp., 4 Cir. 1943, 136 F.2d 835, cert. denied, 320 U.S. 774, 64 S.Ct. 83, 88 L.Ed. 464; The Ada, S.D.N.Y.1916, 239 F. 363, rev'd on other grounds, 2 Cir. 1918, 250 F. 194.[9] The court also concluded, however, that Atlantic fulfilled its duty to mitigate damages, see Glidden Co. v. Hellenic Lines, Ltd., 2 Cir. 1963, 315 F.2d 162, by using the Pan Carib on the Miami to Virgin Islands run and deducted its $17,394.89 profit to arrive at an actual damages award of $94,930.62.

■ Atlantic challenges the denial of its request for an additional $94,350 for lost profits resulting from inability to subcharter the Pan Carib as originally intended. While we agree that the damage award was incorrect, we do not find erroneous the district court's refusal to award $94,350 for loss of the Pan Carib.

The lower court evidently turned for guidance as do we to the opinion of Judge Learned Hand in The Ada, supra,

9. Because a replacement vessel was not available, the ordinary measure of damages, the difference between the charter hire and the cost of obtaining a suitable replacement, was inapplicable. See Polar Steamship Corp. v. Inland Overseas Steamship Corp., 4 Cir. 1943, 136 F.2d 835, cert. denied, 320 U.S. 774, 64 S.Ct. 83, 88 L.Ed. 464; The Ada, S.D.N.Y.1916, 239 F. 363, rev'd on other grounds, 2 Cir. 1918, 250 F. 194.

the only case we have found addressing a similar issue. In that case, the charterer, faced with a $190,000 freight loss by the wrongful withdrawal of the Ada and unable to find a replacement vessel, substituted one of its chartered vessels which would otherwise have earned $125,000. This replacement vessel earned only $90,766.01. The charterer claimed damages for the full $125,000 on the theory that the loss was the necessary consequence of efforts to minimize damages, the result of a prudent attempt, even duty, to sacrifice $125,000 to save $190,000.

The test devised was whether the action taken was a fair exercise of judgment to lessen damages. Because not every effort to minimize damages should automatically entitle the injured party to full recovery for actual losses suffered, especially when it enhances them, the court warned that a charterer who gives up a substantial advantage must look before he leaps. 239 F. at 369. The breaching owner was not held responsible for the additional loss because the charterer's response was not taken in fact in an attempt to reduce damages but to appease shippers. The decision to sacrifice immediate pecuniary interests was not held chargeable to the owner. *Id.*

The findings below similarly encompass a rejection of any "fair exercise of judgment to make damages small" by Atlantic. The court found that Atlantic elected to use the Pan Carib on the Virgin Islands run at a greatly reduced profit in order to maintain its trade routes and good relations with its shippers. Had Atlantic reasonably expected to earn more than the $94,930.62 it stood to lose, this would be a different case. See *The Ada*, supra; Corbin on Contracts, Sec. 1044. Here, however, the court found that Atlantic made a management decision for which Narwhal could not be held responsible. This accords with the legal principles set forth by Judge Hand, with which we agree. Atlantic is not, as it contends, being penalized for attempting to salvage a valuable trade. If the Pan Carib had been

utilized as intended, maximum damages from loss of the Jamaican Provider would not have exceeded $112,325.51. Atlantic cannot increase its damages and force Narwhal to bear the burden of its business decision in its own selfish interest to the extent of an extra and avoidable $94,350.

To stop at this point, however, as the district court did, was error.

In West Lumber Co. v. C. R. Cummings Export Co., Tex.Civ.App., 196 S.W. 546, 552, it is said, citing many authorities: "It is a fundamental and cardinal principle of the law of damages that the injured party shall have compensation for the injury sustained. The injured party is entitled to recover full indemnity for his loss, and to be placed as nearly as may be in the condition which he would have occupied had he not suffered the injury complained of. No measure of damages which does not afford just compensation for the loss sustained can stand the fundamental test. Upon this principle the measure of damages in any case must be based, or it neither accords with principle nor authority."

Courts of admiralty are no exception; indeed, "they administer the broadest equity." The Georgian, 5 Cir., 76 F.2d 550. Putnam Lumber Co. v. Ashcraft-Wilkinson Co., 5 Cir. 1938, 96 F.2d 233, 235.

It is unclear whether Judge Hand in *The Ada* deducted the amount earned by the substitute vessel from the profits lost by the wrongful withdrawal. The court below allowed the deduction, viewing the substitution as an attempt to mitigate damages. Under the circumstances here present we do not believe that any such deduction is proper, for it unfairly penalizes Atlantic for a managerial decision on where to place the vessel in service, an election forced by the premature withdrawal of the Jamaican Provider.

Of controlling significance is the fact that Atlantic could have profitably used both the Pan Carib and the Jamaican Provider. If not for the wrongful termination, the Pan Carib would have been

subchartered at a substantial profit. After redelivery, Atlantic had a choice of subchartering at an anticipated net of $94,350 or of substituting at a much lower profit. It was under no duty to substitute the Pan Carib and could not have been penalized for failure to do so, as it might have been if the vessel had not already been obtained prior to breach or would otherwise have stood idle. The district court specifically found that no substitute vessels were available.

While Atlantic's decision to substitute at a substantial financial loss would not entitle it to profits lost by failing to utilize the vessel as originally intended, neither should its business election forced upon it by a breach of charter work to the financial benefit of the breaching party. Atlantic would have earned $17,394.89 and more from the Pan Carib in any event. That it chose to earn this sum on the Miami to Virgin Islands run instead of on subcharter, giving up the Miami to Jamaica trade entirely, can be of no legally cognizable concern to Narwhal under these circumstances. Only an award computed on this basis would place Atlantic in the condition it would have been in absent breach and its own exacerbating conduct.

Vacated and remanded for further proceedings.