## LOMA FRUIT CO. v. INTERNATIONAL NAV. CO., Limited, et al.*

## SAME v. G. WARREN & CO., Limited, et al.

(Circuit Court of Appeals, Second Circuit. December 21, 1925.)

Nos. 142, 143.

**1. Shipping ⬙132(3)—Exception of ocean carrier from liability for heating, decay, or putrefaction of shipment placed burden of proof of negligence on holder of bills of lading.**

Exception in export bills of lading that ocean carriers should not be liable for heating, decay, or, putrefaction of shipment, placed burden of proof of negligence on holder of bills of lading.

**2. Shipping ⬙132(3)—Burden of proof of negligence on holder of export bills of lading is met by carrier's failure to supply refrigeration required.**

Burden of proof on holder of export bills of lading to prove negligence of carriers resulting in heating, decay, or putrefaction of shipment is met by carrier's failure to supply refrigeration required.

**3. Shipping ⬙132(5).**

Evidence *held* to show that railroad carrier's agent promised shipper refrigeration on steamers for apples shipped for export.

**4. Shipping ⬙120—Ocean carriers had notice that refrigeration for apples to destination was called for, in view of provision in export bills of lading.**

Where export bills of lading provided for refrigeration of shipment of apples to destination, and ocean carriers would not have loaded shipments aboard steamers without first receiving copies of such bills, *held*, that they had notice that refrigeration to destination was called for.

**5. Shipping ⬙106—Ocean carrier, by receiving and carrying shipments of apples, ratified and were bound, as between themselves and shipper, by export bills of lading requiring refrigeration to destination.**

Though provision in export bills of lading requiring refrigeration for shipment of apples to destination was not in accordance with freight contract between railroad and ocean carriers, ocean carriers, by receiving and carrying shipments with notice of such provision, ratified and were bound by bills as between themselves and shipper.

**6. Carriers ⬙35.**

Carrier's agent cannot alter company's tariff rates, or give any shipper preferences or privileges not given to all.

**7. Shipping ⬙106—Railroad carrier's agent held authorized to sign export bills of lading for ocean carriers providing for refrigeration of shipments of apples to destination.**

Engagement of ocean freight space being no part of inland transportation, nor subject to tariff regulations, agent of railroad which engaged ocean carriers to get export business *held*

authorized to sign export bills of lading for ocean carriers, though providing for refrigeration of shipments of apples through to destination, contrary to freight contract between railroad and ocean carriers.

**8. Appeal and error ⬙853.**

Judge's decision, overruling exceptions to petition, becomes law of case.

**9. Admiralty ⬙12—Freight engagements between ocean and railroad carrier held maritime contracts, for breach of which ocean carriers could maintain suit in admiralty.**

Freight engagements between ocean and railroad carriers, by which railroad was to sign bills of lading for exporter, which should bind ocean carrier to transport his shipment of apples to destination under ordinary stowage, *held* maritime contracts, for breach of which ocean carrier could maintain a suit in admiralty.

**10. Admiralty ⬙50—Ocean carrier, liable to shipper for railroad carrier's breach of contract in issuing export bills of lading calling for refrigeration on steamers, might look for indemnity to railroad carrier, and implead it under admiralty rules.**

Ocean carrier, if made liable in damages to shipper for railroad carrier's breach of contract in issuing export bills of lading to shipper calling for refrigeration of shipments of apples on steamers, might look for indemnity to railroad carrier and implead it under fifty-ninth rule.

**11. Shipping ⬙132(5).**

Evidence *held* to show that apples shipped for export were injured by want of refrigeration on steamers.

**12. Carriers ⬙177(4).**

Intermediate carriers *held* not liable for originating carrier's breach of contract with ocean carrier in executing export bills of lading on shipments of apples calling for refrigeration on steamers.

Appeals from the District Court of the United States for the Southern District of New York.

Libel by the Loma Fruit Company against the International Navigation Company, Limited, in which the Atchison, Topeka & Santa Fé Railway Company and another were impleaded, consolidated with libel by the Loma Fruit Company against G. Warren & Co., Limited, in which the Atchison, Topeka & Santa Fé Railway Company and others were impleaded. Decree for libelant against the Atchison, Topeka & Santa Fé Railway Company primarily in both cases, and in first case against the International Navigation Company secondarily, and in the second case against G. Warren & Co. secondarily, and petitions dismissed as to other defendants, and the Atchison, Topeka & Santa Fé Railway Company appeals in both cases. Affirmed.

The following is the opinion in the District Court of Ward, Circuit Judge:

---

*Petitions for writs of certiorari denied, Atchison, T. & S. F. Ry. Co. v. Loma Fruit Co., 46 S. Ct. 471, 70 L. Ed. —.

"These two suits were tried together. The libelant in' the first seeks to recover from the International Navigation Company, owner of the steamship Northland, for damage to five cars of apples, containing 4,680 boxes, under an export bill of lading of the Atchison, Topeka & Santa Fé Railway Company from Watsonville, Cal., to Portland, Me., and thence by the steamship Northland to Liverpool, England; and in the second suit it seeks to recover damages for a similar shipment of seven cars of apples, containing 6,496 boxes, under an export bill of lading of the same railroad, from Watsonville, Cal., to Boston, Mass., and thence by Warren & Co.'s steamer Sachem to Liverpool, England.

"The respondent in each suit impleaded the Atchison, Topeka & Santa Fé Railway Company under the fifty-ninth rule in admiralty, and also the Grand Trunk Railway Company in the first and the Boston & Albany Railroad Company and the New York Central Railroad Company in the second. Sterne, the Santa Fé Company's agent at San Jose, signed its printed export bills of lading from Watsonville, Cal., to Liverpool, for each of the inland carriers and also for the ocean carriers separately. It is in this way that the Santa Fé Company, like all other railroads, does the business, as the testimony of Saiz, the company's agent for foreign business, shows. The material provisions on the face of the bills of lading are as follows:

"'The Atchison, Topeka & Santa Fé Railway Company Coast Lines, in connection with other carriers on the route, received at Watsonville, Cal., from Loma Fruit Company, the following property, in apparent good order, except as noted (contents and condition of packages unknown), marked, numbered, consigned, and destined as indicated below: Consignee and destination: Loma Fruit Company, Liverpool, England. Party to be notified: Simmons, Shuttleworth & Co., Liverpool, England. Marks and numbers: 936 bxs. green apples. Articles: 936 bxs. green apples Newtown pippins. Lighterage free for export. Marine insurance, $1,200. Prem. $1.80. War insurance: $1,200. Prem. $11.40. Route SP Santa Fé CT. Refrigeration to destination. Weight: 46521 (subject to correction). Car: PFE 11281. Ocean rate, forty shillings plus 5 per cent. primage per 40 cubic feet. To be carried to the port (a) of Portland, Me., and thence by steamship Northland, White Star Dom. Line, to the port (b) Liverpool (or so near thereto as ship may safely get,

with liberty to call at any usual port of call), and to be there delivered as above consigned or to another carrier on the route to destination, if consigned beyond said port (b), upon payment immediately on discharge of the property of the freight thereon at the rate from Watsonville to Portland of one hundred cents, United States gold currency, per one hundred pounds gross weight and advanced charges, thirteen and $^{20}/_{100}$, 13.20, a/c premium marine and war insurance. ⁑ * *

"'In witness whereof, the agent signing on behalf of said, the Atchison, Topeka & Santa Fé Railway Company coast lines and of the said ocean steamship company, or ocean steamer and her owner, severally and not jointly, hath affirmed to one original bills of lading all of this tenor and date, one of which bills being accomplished, the others to stand void. Dated at San Jose, Cal., this 31st day of March, 1915. [Signed] H. P. Sterne, Agent, on Behalf of Carriers Severally, but Not Jointly.'

"And similar bills of lading for the shipments of apples from the port of Boston, Mass., by the steamer Sachem, Furness-Withy Line, to the port of Liverpool. [1, 2] "Upon the back are printed separately the general conditions of carriage by the inland carriers and by the ocean carriers; but the particular contract itself, as to the transportation, the goods, their marks, the freight, and the refrigeration, was on the face of the bills of lading. For instance, the exception that the ocean carrier should not be liable for heating, decay, or putrefaction of the shipment, which puts the burden of proof of negligence on the holder of the bills of lading, is met by the carrier's failure to supply the refrigeration required.

[3] "The Santa Fé Company engaged the ocean freight space, and it is quite clear that ordinary stowage only was to be given, because neither of the steamers in question had any refrigerating equipment, and one of the freight contracts expressly stated ordinary stowage. The sharply contested question of fact is whether Sterne promised Baker, general manager of the libelant, refrigeration on the steamers. The testimony satisfies me that he did. Baker and Mrs. Kirkland, libelant's secretary (formerly Miss Wood), so testify. While apples shipped in cold weather, which have not been long in cold storage, may go without refrigeration from Watsonville, Cal., to Europe, apples which have been some four months in cold storage, like those in question, and are shipped in April, do require refrigeration.

It is most improbable that the libelant would have shipped them without refrigeration to destination. Finally, the export bills of lading issued by the Santa Fé Company called for refrigeration to destination, which was stated to be Liverpool.

"The shipments were from Watsonville, under memorandum bills of lading of the Southern Pacific Railroad Company, to Stockton on the Santa Fé's line, which memorandum bills of lading were exchanged, on delivery of the shipments to the Santa Fé Company, for that company's straight export bills of lading from Watsonville to Liverpool. The memorandum bills of lading signed by the Southern Pacific Company were filled up by Miss Wood, who testified she was present at the conversation in which Sterne promised ocean refrigeration to Baker, and that she used these words intending to cover that contract: 'Ice full to destination. Lighterage free for export. Space reserved by Santa Fé.'

"When the memorandum bills of lading were exchanged for the Santa Fé Company's export bills, Sterne himself substituted the following language: 'Refrigeration to destination,' in place of 'Ice full to destination,' on the Southern Pacific Company's memorandum bills of lading. The destination of the shipments was certainly Liverpool, and the words 'Refrigeration to destination' were much more applicable to a contract for refrigeration throughout, as the libelant claims, than the words 'Ice full to destination,' which is more appropriate to refrigerated cars than for steamers, which are refrigerated by cold air.

[4, 5] "The ocean carriers would not have loaded these shipments aboard their steamers without first receiving copies of the export bills of lading, and I find that they did in each case receive those copies before shipment. They must be taken to have had notice that refrigeration to Liverpool was called for. Though this was not in accordance with the freight contract made between them and the Santa Fé Company, I think, by receiving and carrying the shipments, they ratified and were bound by the bills as between themselves and the libelant. Reclamation for any loss they incurred as a result of the misdescription in the bill of lading would have to be made against the Santa Fé Company.

[6, 7] "But it is said on behalf of the Santa Fé Railway Company that Sterne had no power to alter the company's tariff rates, or to give any shipper preferences or privileges not given to all. Hamlen v. Illinois Central R. Co. (D. C.) 212 F. 324; Chicago & Alton R. R. Co. v. Kirby, 32 S. Ct. 648, 225 U. S. 155, 56 L. Ed. 1033, Ann. Cas. 1914A, 501. This is quite true but engagement of ocean freight space is no part of the inland transportation, nor subject to the tariff regulations. Armour Co. v. United States, 28 S. Ct. 428, 209 U. S. 56, 52 L. Ed. 681; Pacific Mail S. S. Co. v. Western Pacific R. R. Co., 251 F. 218, 163 C. C. A. 374. The Santa Fé Railway Company engaged the ocean transportation in order to get the export business. To say that it had no authority to sign for the ocean carrier is going very far, in view of the immense business done under such export bills of lading, which the agents of the railroad companies do sign for the ocean carriers. Certainly it could not guarantee the performance by the ocean carrier of its contract, nor would it be liable for nonperformance. Hamlen v. Railroad Co., supra. The ground of liability is quite different, viz. that it broke its freight contract with the ocean carrier in giving the libelant bills of lading calling for refrigeration on the steamers. No fraud is imputed to the Santa Fé Company, nor is any liability as a common carrier alleged. Mistake as to the actual contract for the ocean freight space, or failure to recollect the terms of it, would be a quite sufficient explanation.

"Furthermore it is contended that, even if Sterne had authority to sign for the steamship company, he had none to sign upon terms different from those which the steamship company had given him, and therefore the Santa Fé Company cannot be impleaded, because this breach of its freight contract is nonmaritime. Aktieselskabet Fido v. Lloyd Braziliero (C. C. A.) 283 F. 62; Central Leather Co. v. The Goyaz (D. C.) 281 F. 259.

[8-10] "Exceptions to the petition on this ground were overruled by Judge Mayer, and his decision is the law of the cases. No opinion of his has been shown me, and therefore I do not know what his reason was; but, as the Santa Fé Company asks me to express an opinion, I will say that I agree with his conclusion. It is to be borne in mind that the ocean carriers were parties to two different contracts: First, the agreements for freight space made with the Santa Fé Company; and, second, the bills of lading with the libelant. The freight engagements between the ocean carriers and the Santa Fé Company were clearly maritime contracts, upon which they could maintain a suit in admiralty. They imported that the Santa Fé Company was to sign bills of lading for an exporter

in California, which should bind the ocean carrier to transport his shipment of apples to Liverpool under ordinary stowage. When that company signed and delivered the bills of lading to the libelant calling for refrigeration on the steamers, though they bound the ocean carriers to the libelant, they violated the freight agreement which the ocean carriers had made with the Santa Fé Company. If they are, as a result, made liable in damages to the libelant, I think they may look for indemnification to the Santa Fé Company, and implead it under the fifty-ninth rule.

"The late Judge Addison Brown, with his characteristic equitable instinct, established this procedure in admiralty in the case of the Hudson (D. C.) 15 F. 162, decided February 7, 1883, and on March 26th of the same year the Supreme Court adopted it in rule 59, 112 U. S. 743. The rule applied only to collision cases, but it was constantly extended by analogy, in the courts of this circuit, to cases which come within its purpose of avoiding a multiplicity of actions. See Public Bath No. 13 (D. C.) 61 F. 692; Dailey v. City (D. C.) 119 F. 1005; The No. K1, 150 F. 111, 80 C. C. A. 65. In these cases the party impleaded was under no direct liability to the libelant, but was liable to the respondent by way of remedy over. This practice has been expressly covered in new rule 56 of the Supreme Court, which allows a person to be impleaded 'who may be partly or wholly liable either to the libelant or to such claimant or respondent by way of remedy over, contribution, or otherwise growing out of the same matter.' Of course, such liability must be of a maritime nature. Aktieselskabet Fido v. Lloyd Braziliero, supra.

[11] "It is also objected that the apples in question were affected by what is known as browning blight, and that their condition on arrival at Liverpool was due to it, and not to want of refrigeration on the steamers. This disease does not show itself on the exterior of the apple, but is a still unexplained condition arising in the interior, first shown by a sparkling or crystallized appearance, which may progress until the apple becomes soft and mushy. The evidence is that this threatened injury does not make such apples unsalable until some two weeks after delivered from the steamer; in other words, that they could be sold at public auction, as the custom is in Liverpool, and could be consumed as sound within that period of time. Mr. Baker, on cutting open some of the apples on a car not shipped, found this sparkling appearance and refused to ship any more.

There are some speculative opinions expressed by an expert connected with the State Agricultural Experiment Station at Geneva and in a report of the Department of Agriculture at Washington as to the character and nature of this disease, which cannot be said to be very conclusive down to the present time. That refrigeration on the steamers would retard the disease in apples shipped in the month of April seems to me very clear. I cannot say how many of the apples were affected by this browning blight when delivered to the steamers, or whether, if such of them as were so affected had been given refrigeration, they would not have arrived in a marketable condition, or in a better condition than they did. The amount of damages will be a question for the commissioner.

"My conclusions are:

"First. That the apples were injured for want of refrigeration on the steamers.

"Second. That the ocean carriers respondent are liable to the libelant for breach of the export bills of lading as to the refrigeration.

"Third. That the Santa Fé Company is liable over the ocean carriers for breach of the freight contract.

"Fourth. That, the freight contracts being maritime and wholly maritime, the Santa Fé Company was properly impleaded under the fifty-ninth rule.

[12] "Fifth. That neither the Grand Trunk Railway Company, nor the Boston & Albany Railroad Company, nor the New York Central Railroad Company are liable in the premises.

"The petitions impleading the Grand Trunk Railway Company, the Boston & Albany Railroad Company, and the New York Central Railroad Company will be dismissed, at the cost of the petitioner. The libelant may take the usual interlocutory decree in each case against the Atchison, Topeka & Santa Fé Railway Company primarily, and in the first case against the International Navigation Company, Limited, secondarily, and in the second case against G. Warren & Co., secondarily."

A. S. H. Bristow, of New York City (William Mann, of New York City, of counsel), for appellant Atchison, T. & S. F. Ry. Co.

Burlingham, Veeder, Masten & Fearey, of New York City (Roscoe H. Hupper, of New York City, of counsel), for appellees International Nav. Co., Limited, and G. Warren & Co., Limited.

Oudin, Kilbreth & Schackno, of New York City (James T. Kilbreth, of New York City, of counsel), for appellee Loma Fruit Co.

Before HOUGH and MANTON, Circuit Judges.

PER CURIAM. Decrees affirmed, upon the opinion of Ward, Circuit Judge, in the lower court.

---

## UNITED STATES ex rel. BRODY v. HECHT, U. S. Marshal.

(Circuit Court of Appeals, Second Circuit. February 8, 1926.)

No. 199.

**1. Criminal law ⌷242.(8).**

Under Rev. St. § 1014 (Comp. St. § 1674), providing for removal of offenders to district where trial is had, duties of district judge are judicial.

**2. Criminal law ⌷242(8)—District judge must issue warrant for removal of defendant, either if each of things required by removal statute is clearly established or if as to some of them he merely entertains doubts as to establishment thereof (Rev. St. § 1014 [Comp. St. § 1674]).**

District Judge, before issuing warrant for defendants' removal under Rev. St. § 1014 (Comp. St. § 1674), must consider whether indictment charges an offense against United States, identity of person whose removal is sought with party indicted, whether court of district to which he is to be removed has jurisdiction to try him for offense charged, and whether there is probable cause to believe that defendant has committed offense with which he is charged, and if each of such things is either clearly established, or if as to some of them judge merely entertains doubts as to establishment thereof, he must issue warrant for removal of defendant.

**3. Extradition ⌷35—Habeas corpus ⌷92(2)—Question whether person demanded is fugitive is for determination of Governor of state on which demand is made, and warrant of arrest issued by him stands in habeas corpus unless clearly overthrown.**

In interstate rendition proceedings question whether person demanded is fugitive from justice of demanding state is for determination of Governor of state on which demand is made, and if he issues a warrant of arrest it must stand in habeas corpus proceeding, unless clearly overthrown.

**4. Criminal law ⌷242(5)—Fact of indictment is not necessarily conclusive in removal proceeding.**

If an indictment is filed in District Court of United States, and person indicted is found in another state and arrested therein, and proceedings are instituted for his removal to district in which indictment was found, so that he may be tried thereon, fact of indictment is not necessarily conclusive.

**5. Criminal law ⌷242(1)—Accused cannot be tried in one district on indictment showing commission of offense in another; removal to district other than one in which Constitution permits trial to be had is unauthorized (Const. Amend. 6; Const. art. 3, § 2).**

Under Const. Amend. 6 and Const. art. 3, § 2, accused cannot be tried in one district on an indictment showing that offense was not committed therein, and removal to district other than one in which Constitution permits trial to be had is unauthorized.

**6. Criminal law ⌷242(5)—Federal judge should not consent to warrant of removal to another district solely on strength of indictment (Rev. St. § 1014 [Comp. St. § 1674]).**

Federal judge to whom an application for warrant of removal is made, under Rev. St. § 1014 (Comp. St. § 1674), should not consent to removal to another district solely on strength of indictment, if it appears that offense was not committed in district in which indictment was found.

**7. Criminal law ⌷242(5).**

Indictment found in district to which removal is sought makes prima facie case for removal.

**8. Criminal law ⌷242(6)—Habeas corpus ⌷92(1)—District Court should be satisfied in removal proceedings that indictment charges offense against United States, but, if sufficiency of indictment is merely doubtful, inquiry on habeas corpus not open.**

In removal proceedings, District Court should be satisfied that on face of indictment an offense against United States is charged; but defendant may be discharged if it appears that indictment is essentially and fundamentally defective, but, if there is a mere doubt as to its sufficiency, inquiry on habeas corpus is not open.

**9. Criminal law ⌷242(8)—Disputed questions of fact or law cannot be decided by court in which removal proceeding is heard.**

In removal proceeding, disputed questions of fact or law must be left to determination of court, where indictment is found, and cannot be decided by court in which removal proceeding is heard.

**10. Sales ⌷201(4)—Delivery of goods to carrier designated by purchaser for transportation is sufficient to pass title in goods.**

Delivery of goods to carrier designated by purchaser is sufficient to pass title in goods, where they are consigned so as to confer on buyer right to receive them from carrier without reservation.

**11. Sales ⌷202(5)—Title to narcotics passed to buyer, where seller delivered same to carrier and received purchase price, and nothing more remained to be done (Uniform Sales Act, §§ 18, 19, rules 1, 4 [Laws N. Y. 1911, c. 571, §§ 99, 100]).**

Title to narcotics passed to buyer, in view of Uniform Sales Act, §§ 18, 19, rules 1 and 4 (Laws N. Y. 1911, c. 571, §§ 99, 100) when seller delivered same to carrier and re-