## THE VESTRIS.

District Court, E. D. New York.

Dec. 6, 1929.

Bigham, Englar, Jones & Houston, of New York City (James Senecal, of New York City, of counsel), for libelant.

Slayton & Jackson, of New York City (G. Noyes Slayton, of New York City, of counsel), for claimant.

INCH, District Judge.

Libelant sues the steamship Vestris to recover damages, alleged to have been sustained by a certain shipment of apples and pears from New York to Brazil, through the neglect of those in charge of the steamship in not maintaining a proper temperature and sufficient ventilation in the place where said shipment was carried.

Claimant's answer admits receipt on board of the apples and pears, and sets forth in detail facts regarding the same. It also refers to the bills of lading, and asserts that it is not liable under the various clauses in said bills of lading which relate to stowage, effects of climate, etc., and further alleges that this fruit was cooled down to within the range of temperature agreed upon, and that reasonable efforts were used to maintain such temperature.

Some testimony was taken by deposition for the claimant, that of Boothby, third officer of the Vestris, and Ball, chief refrigerating engineer of said ship, while for the libelant there was deposition testimony of various consignees, fruit merchants at Rio de Janeiro, Brazil, where the fruit was destined to arrive.

At the trial, additional testimony was given by members of libelant's firm by certain experts for both sides and others.

I am satisfied from all the evidence that the apples and pears were in reasonably good condition when they were placed on board the ship. I am likewise satisfied that, when they reached Brazil, a considerable amount, the exact amount not being here necessary to determine, was in a damaged condition.

The libelant shows that the various lots of apples and pears had been purchased by them in this country, brought to New York and placed in cold storage, where they were duly inspected from time to time and found in good condition; that thereafter they were taken from cold storage, placed in refrigerated cars, loaded on refrigerated lighters, and, while there is some dispute about it, it seems reasonably clear to me that the fruit was, without undue delay, loaded on the vessel. During this time it was inspected, and those that did the inspecting were witnesses, and on their testimony my conclusion that the fruit was in reasonably good condition for the trip is based.

While claimant seeks to raise an inference contrary to this conclusion, I fail to find, in weighing the testimony, that the facts are otherwise.

The fruit was not purchased so long before the trip or kept in cold storage for such an unreasonable length of time as to support the suggestion made by claimant. All the circumstances, which include the inspections and testimony of eyewitnesses, indicate nothing more than a usual shipment of apples and pears at this port. However, the testimony does indicate, as well as common knowledge would suggest, that fruit of this character is necessarily of such a nature as to require special care.

It would seem that this is the very purpose of the various clauses in the contract of the carriage referring to refrigeration and chambers with special temperature.

Where such special care is indicated, reasonable care must be taken to see that it is exercised, and, if the carrier fails to exercise the care required, it may be liable for the damage, even where the nature of the damage, otherwise unexplained, is within an exception of the contract. The San Guglielmo (D. C.) 241 F. 969; Doherr v. Houston (D. C.) 123 F. 334, affirmed (C. C. A.) 128 F. 594.

As to the condition of the fruit upon arrival at Brazil, my conclusion above stated does not seem to me to be seriously controverted. The testimony of Galasso states that,

when the fruit was ready for delivery, it was found that "the pears were all in a rotten condition some of them falling apart and all had soft rotten spots in them. The apples were in a slightly better condition but were spoiled." He attributes this condition "to bad working of the refrigeration system and also to placing the boxes without adequate refrigeration."

On cross-examination, this witness stated "that there was some apples and pears in good condition in each case but about 65 per cent. of each case were absolutely bad"; that he had gone aboard the ship the day of arrival; that the damage was caused by heating or lack of refrigeration.

Marinho, another fruit merchant, says that his particular fruit was likewise damaged; that "the apples were in good condition, some of the pears were in damaged condition. The damaged pears were too ripe and some were rotten"; that those in bad condition were stowed in the center of the square of the hatch; that, when he went on board, "he felt no cold in the hold, that the stevedores were working in their usual clothing, that the temperature could not be cold enough, that he complained to the chief engineer of this and invited him to take a thermometer down to the center of the hold and take the temperature with him, but he refused."

On cross-examination, he stated that the cases in the center of the hatch did not get the same degree of cold as those stowed close to the refrigerator pipes.

It would also appear from the testimony taken by claimant that some sort of such complaint had been made.

I believe, therefore, that this conclusion as to the condition of the fruit upon arrival is justified by the evidence.

Consequently, we start with a case where the proof shows that the fruit had been received by the ship at New York in good condition and had been delivered at Rio de Janeiro, Brazil, in damaged condition. The Skipsea (C. C. A.) 9 F.(2d) 887, 888.

With due regard to the burden of proof, this issue, in my opinion, still further narrows down to the single question, which is, bearing in mind the nature of the cargo and which must have been known to those in charge of the ship, Was it careless to carry this fruit in the manner in which it was carried?

It is evident that those in charge of the ship were seeking to put in her all the freight they possibly could. In doing this they overlooked the nature of libelant's goods, or at least gave little attention to it.

Boothby, third officer, testifies that all the fruit now in question was stowed in No. 2, an upper tween hatch. This hold, while it had some refrigeration, was not what may be termed a refrigerated chamber, of which the ship had several, and the outside walls of which chambers formed the walls of this trunk hatch or hold. When the fruit in question was loaded on the ship, apparently all other space was already occupied, as well as these refrigerated chambers. On recross-examination this ship's officer Boothby gave this significant testimony:

"Q. When you load refrigerated cargo into #2 upper tween deck trunk hatch you first load the chambers? A. Yes.

"Q. And after that you load the hatchway? A. Yes.

"Q. When you haven't a large amount of cargo then no cargo is placed in the hatchway? A. That is right.

"Q. If you had a vacant chamber then you would not place this cargo in the hatchway? A. No."

In other words, cargo of the character here under consideration is ordinarily expected to be carried in the refrigerated chambers, but, as every place was then filled, and they wanted to carry the freight, these boxes of apples and pears were placed in the hatchway around which there was some refrigeration. The method in which these cases were stowed is likewise described by Boothby. First dunnage, three inches thick, was laid, and the tiers of cases of fruit placed upon it. Between the top of the stow and the deck head was about six inches of space. Before the fruit was so stowed the hatch leading to the hold below was sealed, and, after the stow was in place, the top hatch was laid down, caulked, and pitched.

I am unable to find any carelessness in the mere fact that this fruit was carried, under such circumstances, in this upper tween deck hatch instead of in a refrigerated chamber. To do otherwise it seems to me would be placing too great a burden upon the ship. As long as the cases were carried in this place with due regard to their nature and reasonable requirements it seems to me to be all that is necessary.

However, it was neglect to do this very thing which, in my opinion, caused the damage and which is really the solution of this question now presented.

Ball, the engineer, says that these cases of fruit, which were approximately what might be termed open slatted boxes, each 2x1 feet, were stowed in this trunk hatch, end to end, fore and aft. "Q. Were the ends tight against each other? A. Not tight. Q. What was the distance separating them? A. I should say about ¼ of an inch. Q. Was that distance approximately maintained throughout the stowage? A. Approximately maintained throughout the stowage."

This was from a witness for the claimant. When one contemplates the space of a quarter of an inch, it is plain that these boxes of apples and pears were stowed in this hatch practically side by side. To be sure, there was a three-inch space at the bottom of the stowage and a six-inch space at the top, but the hatch was about thirty feet long, twenty feet wide, eight feet high, fitted with insulated hatch covers above and below.

The result is that the ventilation, especially towards the center of this mass of fruit, was entirely inadequate, and, in view of the nature of the merchandise, it is reasonable to hold should have been, in the exercise of the required care, known to those in charge of the merchandise.

This lack of circulation of whatever cold air there was is a sufficient explanation for the condition of the fruit found upon its arrival in Brazil. The expert testimony does not in my opinion contradict this. Even the expert for claimant stated: "If I was stowing them I would have more than ¼ of an inch, probably, but not much more." The experts for libelant all condemn such close stowage of fruit.

Moreover, it seems natural, from everyday experience, that heat would develop, under such circumstances, in the center of the mass, and, as the voyage consumed some seventeen days, natural deterioration might naturally be expected to take place.

Finally, it should be remembered that we are not speaking of stowage in a refrigerated chamber, but rather in an overflow hatch, which, while it had some refrigeration, would not be used according to Boothby until the refrigerated chambers were filled.

This disposes of the question, except that, as is often the case, certain testimony was offered by claimant indicating that in the expert opinion of the witness some of this fruit might have been suffering from disease. In my opinion, this testimony is largely speculative, and I feel that the case of Loma Fruit Co. v. International Navigation Co. (C. C. A.) 11 F.(2d) 124, applies.

Upon the facts, therefore, as found by me, the claimant is not protected by the contract between it and libelant, and as the damage, to some extent at least, shown to have occurred to libelant's fruit, was due to carelessness in not providing reasonably proper and necessary ventilation during the time that the fruit was in custody of the ship, the libelant should succeed, leaving the amount of such damage, etc., to be ascertained later.

Decree for libelant.