**POLAR STEAMSHIP CORPORATION v.
INLAND OVERSEAS STEAMSHIP
CORPORATION et al.**

No. 5052.

Circuit Court of Appeals, Fourth Circuit.

June 7, 1943.

Before PARKER, SOPER, and NORTHCOTT, Circuit Judges.

Lewis F. Glaser, of New York City, (R. M. Hughes, Jr., of Norfolk, Va., and Aaron Frank and Edgar F. Sachs, both of New York City, on brief), for appellant and cross-appellee.

George M. Lanning, of Norfolk, Va., and Joseph K. Inness, of New York City, (Baird, White & Lanning, of Norfolk, Va., on brief), for appellee and cross-appellant.

Dudley C. Smith (John W. Oast, Jr., of Norfolk, Va., on the brief), for appellee Swiss Industries, Inc.

PARKER, Circuit Judge:

These are cross appeals in a suit in admiralty brought by the Inland Overseas Steamship Corporation against the Polar Steamship Corporation to recover damages for breach of a bareboat charter under which the steamship "Hampton Roads" was leased by Polar to Inland. Swiss Industries, Inc., intervened claiming damages for breach of a contract which it had made with Inland for transportation of toluol on the vessel. The District Judge found that the charter party had been breached by Polar and referred the cause to J. Hume Taylor, Esq., as Special Commissioner to ascertain the damages. The Special Commissioner assessed the damages of Inland, apart from the liability to Swiss Industries, at $34,267.50 and the damages of Swiss Industries at $17,869.-39. The District Court entered a decree against Polar for these amounts, and Polar has appealed. Inland has appealed on the

ground that the damages awarded it are inadequate. Three questions are raised by the appeals: (1) whether Polar was guilty of breaching the charter party; (2) whether the damages awarded Inland were assessed on the proper basis; and (3) whether damages in favor of Swiss Industries were assessed on the proper basis and were properly awarded against Polar. We think that all of these questions should be answered in the affirmative.

### The Question of Breach.

The Hampton Roads was a "Lake Type" steamer, constructed during the last World War. She had a capacity of 4,165 dead weight tons and was valued at $175,000. She was owned by Polar and prior to February 24, 1940, was at Baltimore, Md., having been chartered to the Brownsville-New York Line and by it subchartered to Inland for the purpose of carrying a load of scrap iron from Norfolk, Va. to Italy for Ente Distribuzione Rottami, represented in the United States by Shipping Enterprises Corporation. Libels had been filed against her at Baltimore for repair bills, Shipping Enterprises had libelled her for breach of contract and Inland also was threatening to file a libel against her for breach. Under these circumstances an agreement was worked out by which Polar was to release the vessel from existing liens and charters and was to recharter her to Inland; and Inland was to use her to transport the scrap iron for Shipping Enterprises. Inland was without funds but was owned by B. L. Stafford, Sr. and B. L. Stafford, Jr., who were also without means but had had experience in operating vessels and had procured for shipment the cargo of scrap iron from Shipping Industries.

The charter party, which ran for one year, provided for a monthly hire of $5,000 to be paid semi-monthly in advance and for an equal division between the owner and the charterer of the proceeds of the operation of the vessel, after the expenses of operation had been paid. It also provided for the deposit of freight moneys in a joint account and for their use in operating the vessel, the provision with regard thereto being as follows:

"32. The Charterer hereby assigns to the Owner all freight to be paid on or payable under any and all contracts which the Charterer may make during the term hereof; all such charter moneys shall be paid to the Owner and placed by the Owner in a special account subject to withdrawal by two persons, one to be designated from time to time by the Owner and the other by the Charterer; all moneys paid into such special account shall be disbursed only for the following purposes:

"(a) To the payment to the Owner charter hire at the rate herein prescribed in advance for three months, it being intended that the Owner shall at all times while this agreement is in effect be prepaid the amount of said charter hire for three months.

"(b) To the payment of the crew's wages, port charges, stevedoring, fuel expenses and all other expenses of the Charterer incidental to the operation of the vessel.

"(c) To the payment of all moneys payable by the Charterer hereunder, including insurance, which at all times shall be prepaid at least three months in advance.

"(d) To the payment of the salaries of officers of the Charterer for persons other than officers or members of the crew, which salaries shall not exceed Six Hundred (600.) Dollars a month.

"(e) Any balance remaining in said special account shall be divided equally between the Owner and the Charterer and the moneys payable to the Owner pursuant hereto shall constitute additional charter hire hereunder.

There shall at all times be maintained in said special account a minimum balance of Fifteen Thousand (15,000) Dollars to cover crew wages, port charges and the expenses of operating the vessel."

The charter party was executed by Inland on February 26, 1940, and was delivered to one Bernstein, an attorney, in escrow, to be held by him until the liens against the vessel should be lifted and the instrument signed by Polar. An agreement was signed in behalf of Polar at the same time that, upon execution of the charter party, it would agree to waive the requirement of crew wages and charter hire for one round trip to Europe. On March 1, the charter party was executed by Polar and at the same time a letter was signed and delivered to Inland containing the following provision:

"We hand you herewith Counterpart No. 2 of the Charter Party between you and the undersigned dated February 24, 1940 respecting the steamship Hampton Roads, and we hereby tender such steamship to you pursuant to said Charter Party.

"The Steamship is in Baltimore and your Mr. Scott is presently engaged in making an

838

inventory thereof. We are prepared to deliver said steamship to you at once at Baltimore, and we await your advice as to the time that you will accept delivery, which must be before March 5, 1940.

"As heretofore agreed with you, in the event that you exhibit to us signed contracts satisfactory to us for freight or cargoes to be carried on this steamship, made between you and persons satisfactory to us, which will insure to us the deposit in the special account referred to in paragraph 32 of the Charter Party of at least $30,000. prior to the departure of the steamship upon a voyage, we will for the period of such voyage waive the payment of three months' charter hire in advance, and the maintenance at all times in the special account of the sum of $15,000. as required by paragraphs 8 and 32 of the Charter Party, such waiver by us, of course, to be conditioned upon the performance by you of each and every other provision of the Charter Party."

The evidence leaves no doubt but that Inland procured and exhibited to Polar's officers contracts which would have insured the deposit of exceeding $30,000 in the special account as provided for in this letter. A letter was obtained from Shipping Enterprises agreeing to have cargo ready for shipment at Norfolk, to limit the cargo to 2,400 tons and to pay freight in advance to the amount of $23,000 to $24,000. A contract was obtained from Swiss Industries for the transportation to Italy of 400 tons of toluol and for the payment of $14,000 freight thereon in advance. There is some conflict in the testimony as to the notice given Polar with regard to this toluol contract, but we agree with the court below that ample notice was given. The evidence is clear that the contract was or should have been entirely satisfactory to Polar and that express approval was not given merely because Polar was attempting to rid itself of the obligations of its contract.

No contention was made as to the sufficiency of the Shipping Enterprises contract covering the scrap iron. The toluol contract on March 4th was shown to Polar's representative, who stated that he wished a letter from Swiss Industries giving the particulars of the shipment, showing that the cargo would be ready and when the freight money would be paid and stating that the latter was to be assigned to the special account. Inland promptly obtained such a letter and furnished copy thereof to Polar. When the agent of Inland called the agent of Polar over the telephone on March 5th to tell him that the letter had been obtained, the latter waved the matter aside and, as a condition of the delivery of the vessel, made additional demands, which were not authorized by the agreement of the parties and with which everyone understood that Inland would not be able to comply, demanding that Inland pay $2,500 charter hire in advance and put up around $15,000 to pay insurance premiums. At 2:30 on that day he dispatched a letter to Inland stating that, unless the demands were complied with by 5 o'clock, he would declare the charter party breached. Inland replied to this by insisting upon delivery of the vessel under the charter party and the terms of the waiver agreement, but Polar refused to deliver it and proceeded to load the cargo of scrap iron at Norfolk under a contract which it had made with Shipping Enterprises on February 29th.

Polar contends that it was within its rights in demanding that a half month's charter hire and the premiums for insurance be paid in advance of the delivery of the vessel; but we think, as did the court below, that both matters were covered by the waiver agreement. Paragraph 32 of the charter party required that from the special fund charter hire for three months and insurance for at least three months be paid in advance; but the letter of March 1st waived for the first voyage the payment in advance of the three months' charter hire. It waived also the maintenance of $15,000 minimum in the special fund, and this made possible the payment of insurance premiums therefrom if as much as $30,000 was deposited. After the conditions of the letter were complied with, Polar certainly could not insist upon prepayment of charter hire for a part of the three months' period. So far as insurance is concerned, paragraph 32 authorized the payment of this from the special fund; and the special fund was ample to meet this charge when the freights which the waiver agreement contemplated were paid into it. Nothing in the charter or elsewhere required that insurance be paid for in advance of the delivery of the vessel. The parties understood perfectly well that Inland was not able to make these payments except from freights, and the purpose of the waiver agreement was that the first voyage should be financed from freights received in connection with that voyage. Inland complied with the agreement when it procured contracts from

which freights in excess of $30,000 would be paid into the special fund; and Polar may not escape the obligations assumed by it in an effort to rid itself of the embarassing litigation with which it was confronted, by placing upon its agreement a strained construction which could have occurred to no one at the time, and which, we think, is violative of the letter as well as the spirit of that agreement.

Other contentions of Polar, to the effect that Inland had not complied with the obligation to man, fuel and supply the vessel, had not submitted to Polar the form of a bill of lading and had not accepted and paid for the stores on the vessel, are sufficiently answered in the memorandum of the court below and are so manifestly frivolous as not to justify further discussion here. In connection with the acceptance of stores, it is significant that Polar refused to allow the agent of Inland to take an inventory thereof and ordered him off the vessel. This occurred some two or three days prior to the action taken by Polar on March 5th, and the attending circumstances which it is unnecessary to elaborate, show very clearly that even at that time the officers of Polar had no intention of delivering the vessel to Inland under the charter.

### Inland's Damages.

Apart from the damages arising from the breach of the contract of transportation with Swiss Industries, which we shall deal with hereafter, the court below awarded Inland $34,267.50 damages against Polar for breach of the charter party. Of this amount, $7,719.14 represented one-half the profit which the vessel would have earned on her first voyage by transporting the cargo of scrap iron and toluol for which Inland had arranged and by bringing a cargo of iron ore from Spain as she returned, and $26,546.36 represented one-half of what the vessel would have earned for the remainder of the year of the charter period if she had been placed on time charter in the West Indian trade. Inland claims that the award is too low; that the vessel could have earned $999,421.80 during the year in carrying cargo to European ports; and that it is entitled to an award of $499,710.-90, or one-half of the foregoing amount. Polar claims that no damages at all other than nominal damages should have been awarded; that the proper measure of damages was the difference between the charter hire provided in the charter party and the hire necessary to secure another vessel; and that damages based upon expected profits of the vessel were too uncertain, remote and speculative to constitute the basis of an award.

The evidence shows that the vessel made one voyage to Italy, carrying the cargo of scrap iron of Shipping Enterprises which Inland had secured, and returned in ballast; that she was then leased under time charter in the West Indian trade from May to September at a monthly hire of $5.00 per deadweight ton; that she was later used by Polar in the coastwise trade; and that the profits which she earned during the year amounted to only $47,260.79. There was evidence, however, which amply justified the finding that, if the vessel had carried the cargo of scrap iron and toluol for which Inland had arranged, and had brought back a cargo of ore, which she could easily have secured, she would have realized a profit on the first voyage of $15,438.28. There was likewise ample evidence that the vessel could have been placed on time charter in the West Indian trade for the remainder of the charter period; that the average time charter rate for the period in this trade was $3.70 per deadweight ton; and that on this basis the vessel, after the voyage to Italy, would have earned profits of $63,961.40. Inland produced evidence to the effect that it had an offer from Swiss of a second cargo of toluol for Italy; but no binding contract was entered into other than Swiss Industries agreed to pay $1,000 down. It appears, however, that the price of toluol advanced rapidly and that on account of this advance Swiss Industries did not even ship all of the 400 tons which it had contracted to ship in the first cargo. Whether that company would have shipped a cargo in May on the return of the Hampton Roads from her first voyage is, as the Special Commissioner found, entirely speculative.

Italy entered the war on June 10, 1940, and the only European countries with which it was practical for an American vessel to trade after that date were Spain and Portugal. There was much evidence pro and con as to whether the Hampton Roads could profitably have engaged in that trade. There was evidence of an abundance of cargo at American ports for export at high rates to European ports; but American vessels were forbidden by law to go to ports of belligerent countries, and there was evidence that, by reason of the

favored nation clause of Portugese treaties, American vessels were at a disadvantage in trading with that country. The Hampton Roads was a small vessel unsuited for European trade and not in position to compete, for certain types of cargoes carried by the regular lines. More convincing than the opinion evidence offered is the fact that a firm of brokers of high standing decided that the best that could be done with her after her first voyage was to place her on time charter in the West Indian trade and that her owner consented to this arrangement. If profits running into astronomical figures were readily available in the European trade, as Inland contends, it is hardly probable that reputable brokers would have counseled the West Indian charter or that her owner would have consented to it. At all events, the evidence on the point was highly conflicting and the finding of the Special Commissioner that profits which might have been earned in European trade should not be considered was supported by the testimony of men of high standing and wide experience. That finding was approved by the District Court; and we certainly cannot say that it was clearly wrong. We think, too, as did the Special Commissioner and the Judge below, that future profits to be derived from engaging in the European trade, where there was no established business and no contracts upon which such profits could be based, were too uncertain, remote and speculative to furnish the basis of an award. The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937; Ellerson v. Grove, 4 Cir., 44 F.2d 493; De Ford v. Maryland Steel Co., 4 Cir., 113 F. 72; Blanchard v. Ely, 21 Wend., N.Y., 342, 34 Am.Dec. 250; The Tribune, 24 Fed.Cas. page 191, No. 14,171, 3 Sumn 144.

■■ This does not apply, however, to the profits which Inland would have derived from the first voyage. Here Inland had contracts covering the cargo for the outbound voyage, of which Polar was advised. The breach of contract resulted in the frustration of the venture and the loss of profits capable of ready and accurate admeasurement. The rule applies that net profits or earnings which would have been made but for the breach are allowable where they are susceptible of accurate estimation and the evidence is conclusive. 24 R.C.L. 1123; note 53 L.R.A. 105. The same is true of profits which could have been realized from placing the vessel on time charter in the West Indian trade. The damages here were not uncertain, remote or speculative. Such contracts were available, the rate of return was readily ascertainable and this profit could have been realized by Inland with comparative certainty if the charter had not been breached.

■ The distinction between the allowance as damages for breach of contract of profits which are reasonably certain and those which are uncertain and speculative is well settled. It is thus stated by the Supreme Court in Howard v. Stillwell & Bierce Mfg. Co., 139 U.S. 199, 205, 206, 11 S.Ct. 500, 503, 35 L.Ed. 147:

"The authorities both in the United States and England are agreed that, as a general rule, subject to certain well-established qualifications, the anticipated profits prevented by the breach of a contract are not recoverable in the way of damages for such breach; but in the application of this principle the same uniformity in the decisions does not exist. In some cases of almost exact analogy in the facts, the adjudications of the courts in the different states are directly opposite. The grounds upon which the general rule of excluding profits, in estimating damages, rests, are (1) that in the greater number of cases such expected profits are too dependent upon numerous, uncertain, and changing contingencies to constitute a definite and trustworthy measure of actual damages; (2) because such loss of profits is ordinarily remote, and not, as a matter of course, the direct and immediate result of the nonfulfillment of the contract; (3) and because most frequently the engagement to pay such loss of profits, in case of default in the performance, is not a part of the contract itself, nor can it be implied from its nature and terms. Sedgwick on Damages, 7th Ed. [vol. 1], p. 108; The Schooner Lively, [15 Fed.Cas. page 631, No. 8,403], 1 Gall. 315, 325, per Mr. Justice Story; The Anne Maria, 2 Wheat. 327 [4 L. Ed. 252]; The Amiable Nancy, 3 Wheat. 546 [4 L.Ed. 456]; La Amistad de Rues, 5 Wheat. 385 [5 L.Ed. 115]; Smith v. Condry, 1 How. 28 [11 L.Ed. 35]; Parish v. United States, 100 U.S. 500, 507 [25 L.Ed. 763]; Bulkley v. United States, 19 Wall. 37 [22 L.Ed. 62]. But it is equally well settled that the profits which would have been realized had the contract been performed, and which have been prevented formed, and which have been prevented

by its breach, are included in the damages to be recovered in every case where such profits are not open to the objection of uncertainty or of remoteness, or where from the express or implied terms of the contract itself, or the special circumstances under which it was made, it may be reasonably presumed that they were within the intent and mutual understanding of both parties at the time it was entered into. United States v. Behan, 110 U.S. 338, 345, 346, 347, 4 S.Ct. 81 [28 L.Ed. 168]; Western Union Tel. Co. v. Hall, 124 U.S. 444, 454, 456, 8 S.Ct. 577 [31 L.Ed. 479], Philadelphia, W. & B. R. Co. v. Howard, 13 How. 307 [14 L.Ed. 157]."

See, also, Story Parchment Co. v. Patterson, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; H. Koehler & Co. v. York Mfg. Co., 2 Cir., 193 F. 981; Carroll-Porter Boiler & Tank Co. v. Columbus Mach. Co., 3 Cir., 55 F. 451; White v. Miller, 71 N.Y. 118, 133, 27 Am.Rep. 13. In the case last cited the distinction is stated as follows: "Gains prevented, as well as losses sustained, may be recovered as damages for a breach of contract, where they can be rendered reasonably certain by evidence, and have naturally resulted from the breach. * * * But mere contingent or speculative gains or losses, with respect to which no means exist of ascertaining with any certainty whether they would have resulted or not, are rejected, and the jury will not be allowed to consider them." And in Story Parchment Co. v. Patterson, supra, 282 U. S. 555, 51 S.Ct. 250, 75 L.Ed. 544], a tort case arising under the Sherman Act, language is used which is applicable, we think, to damages arising from such a breach of contract as is here involved. The court said: "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise."

The rule is well stated in the American Law Institute's Restatement of the Law of Contracts, sec. 331, as follows:

"(1) Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.

"(2) Where the evidence does not afford a sufficient basis for a direct estimation of profits, but the breach is one that prevents the use and operation of property from which profits would have been made, damages may be measured by the rental value of the property or by interest on the value of the property."

With respect to the inclusion in the award of the amount that might have been earned by placing the vessel on time charter after the first voyage, the rule is thus well stated by Dean McCormick in his work on Damages at p. 106: "When a claim for loss of profits is disapproved as too uncertain, the court will nevertheless allow, as an alternative basis of recovery, one of these 'standardized' measures of recovery. This is illustrated in cases where the defendant has contracted to furnish or repair machinery necessary for the operation of the plaintiff's mill or plant, when the plaintiff may recover the value of the use of the machine during a period of delay, or where to the defendant's knowledge the machine was not replaceable elsewhere, in which case the plaintiff may even recover the loss of rental value of the plant itself, or interest on the investment during the 'shutdown'".

Directly in point with respect to the inclusion of what might have been earned on time charter is Gans S. S. Line v. Wilhelmsen, 2 Cir., 275 F. 254, 265, where Judge Hough, speaking for the court, said: "The measure of damages under the abnormal condition of affairs during the great war is very perplexing. All parties concede that the Gans Line could not secure a steamer like the Themis. We do not think that it was its duty to secure two steamers aggregating her dead weight tonnage. To estimate the profits it would have earned had it received and used the steamer involves speculation to a degree, which as the Commissioner and the court below found, makes such a measure entirely unsatisfactory. It seems to us that the fair measure of damages is what the

Gans Line could have got for the steamer in the market had she been delivered to it in time."

■ We have considered Inland's contention that European time charter rates rather than those prevailing in the West Indian trade should have been taken as the basis of the award. The evidence, however, is to the effect that the vessel was suitable for the West Indian and not for the European trade; and there is no evidence that she could have been placed on time charter in the latter. Furthermore, the expenses of operation in the European trade, due to the necessity of paying war bonuses to the crew and higher insurance rates, were greater than in the West Indian trade, and it is not certain that the profits from such a chartering would have been greater. The evidence shows that some European charters were at rates as low as $5.00 per deadweight ton; and, when expenses are allowed at the rate shown by Inland's figures for operation in the European trade, the profits on a charter yielding $5.00 would not exceed the profits allowed by the Special Commissioner. We have considered, also, the contention that $5.00 per deadweight ton should have been taken as the West Indian rate in view of the fact that the vessel was placed on time charter from May to September at this rate. The answer, as the Special Commissioner pointed out, is that charter rates in that trade declined after September and that only the average rate over the entire period covered by the charter properly measures the damages.

■ Polar contends that, not profits which might have been earned, but only the difference between the charter hire and the hire necessary to secure another vessel are recoverable. The rule contended for does not apply, however, where another vessel is not obtainable. Gans S. S. Line v. Wilhelmsen, supra, 2 Cir., 275 F. 254; The Ada D. C., 239 F. 363, 364, reversed on other grounds, 2 Cir., 250 F. 194. Here no other vessel was obtainable by Inland. The evidence is that efforts were made to obtain one but without success. And the fact that Inland's inability to obtain one may have been due to its financial condition does not affect the matter. Polar knew of this condition and drew the charter and the waiver agreement to make provision for it. The breach of the charter thus resulted in special damages because of the peculiar circumstances of the case of which Polar had full knowledge; and Polar may not escape responsibility for the damage which it must have known would result from the breach. The case is not unlike that of breach of contract to lend money, where, in ordinary cases, the measure of damages is the additional cost of obtaining a loan from another. If, however, the lender knows of circumstances which will render it impossible for the borrower to obtain such loan and knows that he will suffer special damage as a result of the breach of the contract, such special damage is recoverable. 15 Am.Jur. 466.

### Damages of Swiss Industries.

The court below awarded damages against Polar in the sum of $17,869.39 in favor of Swiss Industries on account of breach of the contract between Swiss Industries and Inland to transport the 400 tons of toluol. The facts are that Swiss Industries had a firm contract with the Swiss government for the sale of the toluol and held an irrevocable letter of credit covering the purchase price. It entered into a binding contract with Inland to transport it on the Hampton Roads, and had arranged with the producers to deliver it aboard the vessel. The damages awarded represented the difference between the price it would have been required to pay for the toluol and the price it would have received from the Swiss government, less freight, diminished by the profit realized from a delivery subsequently made under the contract. The evidence shows that Swiss Industries endeavored to obtain another vessel on which to make the shipment, but without success until the price of toluol had advanced to such an extent as almost to wipe out its profit. Upon failure to make the shipment on the Hampton Roads the offers held by Swiss Industries were cancelled, and the shipment subsequently made was procured by purchases made at a higher price.

■ Polar contends that Swiss Industries is not entitled to recover damages because it did not have title to the toluol which it had contracted to ship. The evidence shows, however, that it had a firm contract for the sale of the toluol and firm offers which it would have accepted and which would have resulted in the purchase and delivery of the toluol aboard the vessel if the contract of carriage had not been breached. The damage arising from the breach of the contract of carriage therefore, was not a mere matter of speculation. The contract for the sale of the toluol was

made in the regular course of trade and in accordance with accepted business practice. It was frustrated when the contract of carriage was breached, for no other vessel was then obtainable by which shipment could be made. Its frustration resulted in the loss of definite profits; and we see no reason why these should not be awarded as damages.

■ The handling of toluol presents a situation the reverse of that involved in the handling of ordinary commodities. The contract of sale is made in advance of purchase, for the reason that toluol is not a commodity that can be stored and held for shipment. In an ordinary case, damages for failure to transport are fixed with sufficient certainty when commodities have been purchased, although not sold, where the evidence shows their market value at the time and place they should have been delivered; and we think they are fixed with sufficient certainty where there is a firm contract for sale at destination and the evidence shows that the commodity to be shipped is obtainable at a certain market price at the point of origin. Of course, if there were no contract at either end, damages would be speculative. Cf. Grimwood v. Munson S. S. Line, 2 Cir., 273 F. 166.

■ The profits here involved were recoverable because both Inland and Polar were advised of the terms of the contract between Swiss Industries and the Swiss government and must have known that special damages would necessarily result from breach of the contract of carriage. There is no evidence, moreover, that the offer of the Swiss government did not correctly mirror the market price of the toluol at the time and place of delivery; and we think that the offers held by Swiss Industries were shown to accord with the market price at the time and place of shipment. Lost profits, therefore, correspond to the rule ordinarily applicable for breach of a contract of carriage, i.e. damages are assessed at the difference between market value at points of shipment and destination, less freight. The Oregon, 6 Cir., 55 F. 666; 13 C.J.S., Carriers, § 38, p. 82.

It is argued that Swiss Industries could have reduced its damages by buying and storing the toluol until transportation was obtainable; but toluol is not a substance that can be thus stored. For this reason, Swiss Industries was compelled to make immediate sale of 100 tons which were delivered to it for transportation on the Hampton Roads and purchase at a higher price when a vessel was obtained sometime later. The court below gave credit on the award of damages for the profits realized on this subsequent transaction. There can be no question, as the Special Commissioner and the Court below held, but that Swiss Industries did everything in its power to minimize its damages.

■ We are not impressed with the argument that there is no liability on the part of Polar for the damages suffered by Swiss Industries because there was no privity of contract between the two. The contract was between Swiss Industries and Inland, and Polar was fully advised of it. Polar's wrongful breach of the charter party caused the breach by Inland; and a question arises as to whether Polar would not be directly liable in tort to Swiss Industries for wrongfully causing this breach. See A. L. I. Restatement of Torts, § 766; note 84 A.L.R. 44. We need not go into this, however, since Inland is liable to Swiss Industries for the breach and Polar is liable to Inland for any damages which Inland may be required to pay on account thereof. It avoids circuity of action and accords with the modern concept of orderly procedure to allow the whole matter to be determined in one suit and decree to be entered directly against Polar for the damages suffered by Swiss Industries for which Polar is ultimately responsible. See Rule 14(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. We think that what was done here is expressly authorized by Admiralty Rule 56, 28 U.S.C.A. following section 723. Loma Fruit Co. v. International Nav. Co., Ltd., 2 Cir., 11 F.2d 124.

There was no error and the decree appealed from will be affirmed.

Affirmed.