In the Matter of PARKVIEW–GEM, INC., a Delaware Corporation, Debtor.

William F. MAUER, Trustee, Plaintiff/Appellant,

v.

CORONDOLET REALTY TRUST, Defendant/Respondent.

Nos. 78–0731–CV–W–2, 73–B–1683–W–2.

United States District Court, W. D. Missouri, W. D.

Feb. 20, 1979.

Patrick Lysaught, Jackson & Sherman, Kansas City, Mo., for plaintiff-appellant.

Michael R. Roser, Berman, DeLeve, Kuchan & Chapman, Kansas City, Mo., for defendant-respondent.

## MEMORANDUM OPINION AND ORDER AFFIRMING THE DECISION OF THE BANKRUPTCY JUDGE

COLLINSON, District Judge.

## I. INTRODUCTION

This is an appeal by the trustee for Parkview-Gem, Inc., a debtor in reorganization proceedings under Chapter X of the Bankruptcy Act, 11 U.S.C. §§ 501 et seq. (1970). The Bankruptcy Court allowed in part certain claims asserted against Parkview by Corondolet Realty Trust. Corondolet has not appealed those portions of the Bankruptcy Court's order which deny in part the

claims in question. Pursuant to Local Bankruptcy Rule 19(F), the parties have stipulated that the appeal may be considered on the briefs filed in the proceedings below.[1]

The issue on appeal is whether the Bankruptcy Court erred in partially allowing repair and remodeling expenses in computing a lessor's claim for damages under § 202 of the Bankruptcy Act, 11 U.S.C. § 602, which in relevant part provides:

> The claim of the landlord for injury resulting from the rejection of an unexpired lease of real estate or for damages or indemnity under a covenant contained in such lease shall be provable, but shall be limited to an amount not to exceed the rent, without acceleration, reserved by such lease for the three years next succeeding the date of the surrender of the premises to the landlord or the date of reentry of the landlord, whichever first occurs, * * *.

The Court has jurisdiction to decide the issues presented in this appeal under the provisions of 28 U.S.C. § 1334 and 11 U.S.C. § 11(10). For the reasons stated below, the order of the Bankruptcy Court will be affirmed.

## II. STATEMENT OF FACTS

In November, 1966 and October, 1967, four leases on property located in Memphis, Tennessee were executed between Corondolet as lessor and Parkview as lessee.[2] Each leasehold was for a twenty-year term. The leases called for a minimum base rental, payable in monthly installments, and an annual adjustment based on the All Commodities Wholesale Price Index published by the United States Department of Labor. This adjustment was designated "additional rental." Also payable as "additional rental" by the lessee were all taxes, assessments

---

1. The order transmitting the record notes that the four depositions contained therein were not considered by the Bankruptcy Court because they had not yet been filed. Accordingly, those depositions have not been considered by this Court. The facts are not in dispute. Consequently, no evidence was heard by the Bankruptcy Court and the case was decided on the briefs.

2. Corondolet refers to the properties as Lamar, Watkins, Sumner and South. The trustee refers to them as Lamar, Crosstown, East and South. In all relevant provisions, the leases were identical and, therefore, the different designations do not affect the issues presented for decision.

and other public charges on the property. Parkview covenanted to pay all utility bills and to maintain both casualty and liability insurance on the premises. Parkview was also obligated to make all repairs necessary to maintain the premises in good and safe condition. The leases were thus what the parties have called "net-net," that is, the lessee was to pay all costs attributable to occupancy of the premises except ground rent.[3]

In April, 1973, Parkview gave Corondolet notice that it intended to cease doing business at all four locations. Rent was paid through August, 1973. At that time, an agreement was executed suspending Parkview's rental obligations on three of the properties and modifying its obligations on the fourth. The agreement recited Parkview's financial difficulties and stated that Corondolet was attempting to relet the premises. Among the various provisions were the following:

> Corondolet *agrees not to look to Tenant* under said leases, *or Parent* under its guarantee of said leases, for payment of all monies expended and to be expended by Corondolet in order to remodel said premises and otherwise make them ready for occupancy by new tenants. The approximate cost of such remodeling is presently estimated to be $1,850,000.00.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Anything to the contrary herein contained notwithstanding, in the event that either Tenant or Parent files a petition or in the event any petition is filed against either of them under any provision of the Bankruptcy Act, \* \* \*, then upon the happening of such event all payments

suspended pursuant to the terms of this agreement shall be deemed automatically and ipso facto reinstated in full and shall be immediately due and payable without notice or demand (which notice and demand are hereby waived) and any and all claims Corondolet may now have and then may have against either or both of said Tenant or Parent under and pursuant to the aforesaid four (4) leases and the guarantee thereof by Parent and under and pursuant to the guarantee of both Tenant and Parent contained in this agreement shall be provable and allowable in full, which claims shall include but will not be limited to *claims for damages arising from the breach* of the aforesaid leases *and all costs and expenses of remodeling and reletting* said premises.

\*　　\*　　\*　　\*　　\*　　\*

Tenant and Parent shall at their own cost and expense make any necessary repairs to the aforesaid premises so as to put said premises in a reasonable condition for construction to proceed in order to accommodate new tenants. Corondolet agrees to cooperate so as not to require any repairs that would be obviated by contemplated reconstruction of such premises.

\*　　\*　　\*　　\*　　\*　　\*

(Emphasis added.)[4]

As things turned out, Parkview was unable to meet its general financial obligations and the reorganization proceedings were commenced. Thereafter, the trustee rejected, or caused to be rejected, all four leases pursuant to § 116(1) of the Bankruptcy Act, 11 U.S.C. § 516(1).[5] In due course,

---

3. In October, 1967, the leases were amended to reflect an assignment by Parkview to Gem International, Inc., a wholly-owned subsidiary, with the former remaining liable for rent. In July, 1972, Gem was merged into Parkview and all rights under the leases were assigned to Parkview-Gem of Tennessee, Inc., another wholly-owned subsidiary of Parkview. All four leases were guaranteed by Parkview as parent of the subsidiary-tenant. In this opinion, the lessee will be referred to as Parkview for the sake of convenience.

4. Agreement of August 31, 1973, ¶¶ 2, 10, 12.

5. Rejection of such an executory contract, 11 U.S.C. § 506(7), gives the injured party a claim for damages by virtue of the provisions of § 63(c) of the Bankruptcy Act, 11 U.S.C. § 103(c), which provides:

> Notwithstanding any State law to the contrary, the rejection of an executory contract or unexpired lease, as provided in this Act, shall constitute a breach of such contract or lease as of the date of the filing of the petition initiating a proceeding under this Act.

Corondolet filed three claims in the reorganization proceedings claiming damages resulting from rejection of the leases.[6]

Parkview was what the parties have called a "single-user." This means that the entire leased area in each of the four locations was used for one retail operation. Following rejection of the leases, Corondolet attempted to obtain new "single-user" tenants but, for one reason or another, was unable to do so.[7] All four properties were ultimately relet to "multiple users," i. e., several smaller retail stores. These lessees demanded that Corondolet make extensive renovations and repairs to the four locations. The alterations were made and Corondolet incurred expenses totaling $3,340,424.00 for the four properties.

## III. THE DISPUTED CLAIM

■ Under § 202 of the Bankruptcy Act, 11 U.S.C. § 602, quoted above, the most that can be recovered as damages from rejection of an executory lease is the rent reserved for the three years following termination of the leasehold. The relevant three-year period in this case is September 1, 1973 to August 31, 1976. Parkview would have paid $3,299,349.00 for rent on the four properties during that period of time. Accordingly, that figure is the maximum amount allowable.[8]

■ During the three-year period, however, Corondolet collected rent from the new tenants totaling $1,922,312.00. The difference between what Parkview would have paid and what the new tenants paid is $1,377,067.00. This amount is clearly allowable under the statute and there is no dispute on that point.

6. Claim No. 1487 asserted claims based on rent. Claim No. 1486 asserted claims based on Parkview's status as guarantor of the leases. See, note 3, *supra*. Claim No. 1485, the subject of this dispute, asserted claims for the remodeling expenses.

7. Corondolet states that the inability to obtain such tenants was due to the depressed state of the general economy in 1973. Corondolet's Brief, p. 2–3.

Corondolet contended in the Bankruptcy Court that it should also be entitled to recover the remodeling expenses it incurred in obtaining the new tenants. Its position was that these expenses were reasonable and necessary to mitigate the damages. As noted, these expenditures totaled $3,340,424.00. This figure added to the difference in rental would give Corondolet a claim totaling $4,717,491.00. However, since the statute sets the maximum allowable claim at three years' rental, in this case $3,299,349.00, Corondolet contended that it should be allowed that sum.

Responding to the claim for expenses, the trustee argued that the remodeling enhanced the value of the premises by changing single-purpose facilities into more marketable multipurpose facilities. The trustee also argued that the remodeling allowed Corondolet to obtain leases for a longer term and that this factor also enhanced the value of the premises.[9] The trustee pointed out that the four properties could have been relet as warehouse space without any renovation and the difference in rent would have been an allowable claim. That being so, continued the trustee, the fact that Corondolet voluntarily opted for higher rent and good long-term tenants by altering the premises should not be allowed to enhance its claim. This is because the trustee viewed the remodeling charges as "more than offset" by the increased value of the premises. Trustee's Brief, p. 3. Finally, the trustee contended that these expenditures are not really expenses in the accounting sense because the remodeling costs have been amortized over the terms of the new leases or longer for the work done to the buildings.

8. All figures set forth in this opinion are aggregated sums for the four properties. Although the parties have separately calculated the rental and remodeling expenses attributable to each location, aggregate figures will be used for convenience.

9. Parkview's leases would have expired in 1986. Some of the new tenants have signed leases which obligate them to 1993.

The trustee concedes that items of expense incurred by a lessor for repairs which were intended to be included as rental under a "net-net" lease are properly chargeable to the lessee. The trustee argues in this case that the only such items properly chargeable to Parkview are expenses for roof repair since Parkview would have been obligated under the leases to make such repairs. The amount spent for roofing repairs on the four properties totaled $200,753.00. This figure added to the difference in rental would give Corondolet a claim totaling $1,577,820.00.

Thus, the parties agree that Corondolet has an allowable claim but disagree by $961,237.00 as to the amount of the claim. The Bankruptcy Court allowed less than Corondolet claimed but more than the trustee conceded. Emphasizing that a Bankruptcy Court is a court of equity, and recognizing that there was some merit to both sides of the dispute, the Court stated:

> . . . because it is impossible to determine from the evidence the increased value of the premises to the landlord over the years, I will allow the landlord's expenses for sitework, roof and building structure in sum [sic] of $1,161,990 . . for the four locations; the balance is disallowed.[10]

This resulted in partial allowance of Corondolet's claim as follows:

| | |
|---|---|
| Maximum allowable | $3,299,349.00 |
| Rent received | 1,922,312.00 |
| Difference | $1,377,037.00 |
| Repairs expense | 1,161,990.00 |
| TOTAL | $2,539,027.00 |

## IV. DISCUSSION

It is important to note that Corondolet's claim for remodeling expenses purports to be based on the leases and the suspension of payments agreement of August 31, 1973.[11] The claim is thus limited by § 202 of the Bankruptcy Act, 11 U.S.C. § 602, quoted above, and is not expanded by any other statutory provision. Accordingly, the first question is whether such expenses constitute part of the lessor's claim for rent. If not, the question is whether expenses incurred for the purpose of mitigating the damages associated with the lessor's claim for rent are recoverable. If such expenses are recoverable, the issue is whether the Bankruptcy Court correctly allowed the expenses incurred for sitework, roof and building structure.

There is nothing in any of the four leases which could possibly be construed as making remodeling expenses part of the reserved rental. Some items, such as taxes and assessments, were designated "additional rental." Other items, such as maintenance, insurance and utilities, were written in terms of covenants rather than actual rent.[12] It is clear, however, that for purposes of a landlord's rent claim under a "net-net" lease, these items are recoverable. *In re United Cigar Stores Co. of America*, 86 F.2d 629 (2d Cir. 1936), *cert. den.* 300 U.S. 679, 57 S.Ct. 671, 81 L.Ed. 883 (1937), involved a landlord's rental claim under the statutory predecessor of § 202. In addition to the three years' rental, the lessor claimed expenses incurred in making repairs and maintaining the property during the relevant three-year period. The Bankruptcy Court held that these items were not rent under the lease and disallowed that portion of the claim. The Court of Appeals reversed, noting that the lessee was obligated under the lease to make such repairs and that the lessee's failure to do so would have given the lessor all the rights associated with breach of the lease. The court also noted that the actual rent would probably have been higher if the lessee was not obligated to make repairs. Accordingly, the court stated:

> These expenditures seem to us to have been made rent by agreement of the parties just as truly as were the taxes and water rates, and, so far as they are prop-

---

10. The $1,161,990.00 figure is not disputed and simply represents the aggregate expenses on the four properties for sitework, roofing and building structure.

11. See text at note 4, *supra*.

12. See text at note 3, *supra*.

erly proved, they ought to be allowed as such.

*In re United Cigar Stores Co. of America, supra* at 633. In this case, of course, the issue is not the allowability of expenses for repairs and maintenance. The question here involves expenses incurred in remodeling the premises for new tenants.[13]

■ The leases provide no basis for arguing that remodeling expenses were intended to be part of the rent. *United Cigar* indicates that even though the parties have not specifically labeled an item as "rent," certain things will be included in the lessor's rent claim so long as it can be said that the parties intended for such things to be in the nature of rent. No such statement can be made in this case. It is clear from the absence of any lease provisions that the parties simply did not contemplate the possibility of remodeling for new tenants when the documents were executed. It is also clear from the specific provisions of the suspension of payments agreement that the parties regarded rent claims and remodeling claims as separate. The insolvency clause of that agreement states that the lessor's claims ". . . shall include *claims* for damages arising from the breach . . . *and* all costs and expenses of remodelling. . . ." Agreement of August 31, 1973, ¶ 10. (Emphasis added.)

There does not appear to be a case specifically holding that claims for remodeling expenses are separate from rent claims. Some dicta to that effect, though, appears in *In re Plywood Company of Pennsylvania*, 425 F.2d 151 (3d Cir. 1971), where the issue was whether the lessor could retain security deposits, labeled "liquidated damages" in the lease, and also recover additional damages for lost rental. Approximately one year into the lease, the lessee initiated arrangement proceedings under Chapter XI of the Bankruptcy Act, 11 U.S.C. §§ 701 *et seq.* The lessee's receiver remained in possession for some time until the lessor relet the premises to a new tenant on October 28,

1967. The new tenant was authorized to take possession immediately but rental payments were not to commence until January, 1968. This was to give the new tenant time to make certain alterations.

The new tenant was to alter the premises in accordance with its own specifications. There was testimony that the tenant would not execute the lease unless there was a satisfactory provision for alterations, and unless his rent would not begin until January 1, 1968. There was also testimony that the increased rent over the period of the new lease was absorbed by the portion of the cost alterations paid by [the lessor].[1]

[1] The new lease provided that the lessee was to make the alterations, and that the lessor was to pay one-half of the cost provided the lessor's contribution did not exceed $8500. There was testimony that this amount was paid to the lessee.

*In re Plywood Company of Pennsylvania, supra* at 153. The court ultimately held that since the lease provided for liquidated damages in the event of bankruptcy, the lessor could not prove a claim for additional damages based on lost rent. However, the court went on to state:

Since the liquidated damage clause eliminated the need to prove damages and since we have held that [the lessor] may not assert the claim for damages in lieu of rent, it is actually unnecessary to consider whether [the lessor] in fact suffered damages. There is, however, testimony that the increased rent on the new lease was needed to pay for alterations necessitated by the new tenant. If the increase covered this amount, [the lessor] then lost three months' rent from October 1, 1967 to January 1, 1968. Although the Referee did not make a specific finding on this point, it is implied in this decision permitting the claim.

*In re Plywood Company of Pennsylvania, supra* at 156–157. This language shows that the court viewed the lessor's damage claims as limited to lost rental. If he had

**13.** The holding in *United Cigar* is the basis for the trustee's concession that roofing expenses incurred by Corondolet should be allowed since

they are properly designated as rental under a "net-net" lease.

been permitted to prove his claim for damage, it would not have included the $8500.00 spent on alterations.

The Court thus holds that the expenses in question do not constitute part of Corondolet's claim for rent. There is nothing in the documents to indicate the contrary and the law appears to limit claims under § 202 to lost rent. Accordingly, the question is whether the expenses can be recovered as being necessary for mitigation of the damages.

■ The common law of both Missouri and Tennessee, the state where the leases were executed and where the four properties are located, appears to be that a landlord has no duty to mitigate his damages when a tenant defaults on a lease. See, *Whitehorn v. Dickerson*, 419 S.W.2d 713, 716–717 (Mo.App.1967) (Missouri and Tennessee law); *Hurwitz v. Kohm*, 516 S.W.2d 33, 37 (Mo.App.1974) (Missouri law). The rationale for this rule is that since a lease is a conveyance of an estate in land, and since the lessee is the owner of the land for the term of the lease, it should not matter that the "owner" allows the property to lie idle. Another justification is that a tenant who breaches his lease cannot impose an affirmative duty to act on the innocent landlord.[14] These justifications for the rule are based on the corollary rule that a default does not automatically terminate the leasehold but simply gives the landlord a right of reentry. *Babcock v. Rieger*, 76 S.W.2d 731, 735 (Mo. App.1934); *Jennings v. First National Bank of Kansas City*, 225 Mo.App. 232, 30 S.W.2d 1049 (1930); *Von Schleimitz v. North Hotel Co.*, 323 Mo. 1110, 23 S.W.2d 64 (1929).

■ However, when the landlord treats a default as a termination of the lease, he is under a duty to mitigate the damages according to ordinary principles of contract law. In *Consolidated Sun Ray, Inc. v. Oppenstein*, 335 F.2d 801, 810 (8th Cir. 1964), the court, applying Missouri law, stated that a lessor has three options when his tenant defaults: (1) to remain out of possession, treat the term as subsisting and recover rent; (2) to give notice to the tenant, resume possession and relet to mitigate the damages, collecting his loss from the tenant; and (3) to re-enter, resume possession in his own right and close the term. Rejection of a lease by a trustee in bankruptcy forces option number two on the lessor by virtue of § 63(c) of the Bankruptcy Act, 11 U.S.C. § 103(c), which provides that rejection constitutes a breach of the lease.[15] Since rejection had the effect of terminating the leasehold, Corondolet was under a duty to use reasonable efforts to mitigate its damages.[16]

■ As a general rule, a party may recover expenses incurred in the exercise of reasonable diligence to prevent or minimize damages resulting from breach of his contract.[17] *Santa Fe Trail Transp. Co. v. Peoples*, 281 F.Supp. 692, 696–697 (W.D.Mo. 1967) (labor contract); *Tampa Electric Co. v. Nashville Coal Co.*, 214 F.Supp. 647, 652 (M.D.Tenn.1963) (sale of goods). See also, *Beggs v. Dougherty Overseas, Inc.*, 287 F.2d 80, 83 (2d Cir. 1961) (employment contract). *Cf. Distillers Distributing Corp. v. J. C. Millett Co.*, 310 F.2d 162, 165 (9th Cir. 1962). The general rule follows from the doctrine of foreseeability first announced in *Hadley v. Baxendale*, 9 Ex. 341 (1854), and codified in the *Restatement of Contracts*, § 336(2):

> Damages are recoverable for special losses incurred in a reasonable effort, wheth-

---

**14.** The rule that there is no duty to mitigate damages, and the reasons for the rule have been criticized and abandoned in some states. See, *e. g.*, *Wright v. Baumann*, 398 P.2d 119 (Or.1965). See generally, Anno., Damages—Mitigation by Landlord, 21 A.L.R.3d 534, 565–572 (1968).

**15.** See note 5, *supra*.

**16.** The trustee has suggested that the premises could have been relet as warehouse space with-

out renovation. See text at note 9, *supra*. The court in *In re Mullings Clothing Co.*, 252 F. 667, 670 (D.Conn.1918), held that a lessor must use his best efforts to obtain another tenant at the highest possible rental to reduce the damages as much as possible.

**17.** On the measure of damages generally for breach of a lease in a bankruptcy setting, see Restatement of Property, 2d, Landlord and Tenant, § 21.1, Reporter's Note, at p. 315 (1977).

er successful or not, to avoid harm that the defendant had reason to foresee as a probable result of his breach when the contract was made.

In the context of antitrust damages, which are based on tort concepts but which nevertheless are relevant to the issue of mitigation expenses, the court in *Momand v. Universal Film Exchange*, 72 F.Supp. 469, 476–477 (D.Mass.1947),[18] stated:

> The general principle which is at least as old as Lord Ellenborough's decision in *Jones v. Boyce*, (1816) 1 Stark. 493, and is familiar in ordinary . . . [citations omitted] . . ., and extraordinary tort cases, . . . [citations omitted] . . ., as well as in the admiralty, . . [citations omitted] . . ., and even in contract cases when special damages are foreseeable, *The Ada*, D.C.S.D.N.Y., 239 F. 363, 369, reversed on other grounds 2 Cir., 250 F. 194; *Le Blanche v. London & Northwestern Ry. Co.*, L.R. 1 C.P.Div. 286 (1876): Williston, Contracts (Rev.Ed.) § 1354 vol. V, p. 3798; Mayne, Damages, 10th Ed., p. 95, has been stated in these words in Restatement, Torts, § 919:

> "§ 919(1) A person whose legally protected interests have been endangered by the tortious conduct of another is entitled to recover for expenditures reasonably made or harm suffered in a reasonable effort to avert the harm threatened.

> (2) A person who has already suffered injury by the tort of another is entitled to recover for expenditures reasonably made or harm suffered in a reasonable effort to avert further harm."

> As the rule is stated, and as the decisions of Judge Learned Hand in *The Ada* and the English court in the *Le Blanche* case illustrate, expenditures are recoverable only if they are "reasonably made" and harm is compensable only if it was the result of a "reasonable effort to avert the harm threatened" and "further harm."

These principles indicate that Corondolet is entitled to recover for those expenses which were necessarily incurred for the purpose of securing new tenants and thereby mitigating the damages. There is some authority for this proposition in the bankruptcy context. In *Ten-Six Olive v. Curby*, 208 F.2d 117 (8th Cir. 1953), the court held that there had been a surrender of the demised property by the bankrupt and an acceptance by the landlord. The landlord, therefore, was not entitled to prove a claim for damages since surrender and acceptance precludes rejection of the lease. The court stated:

> Nor could [the lessor] recover other expenses connected with securing a new tenant because the liability of the bankrupt ceased with the surrender and acceptance of the lease. Such surrender and acceptance effectively terminated all liability not then accrued. [Citations omitted.]

*Ten-Six Olive v. Curby, supra* at 122–123. This language indicates that the lessor could have recovered expenses associated with securing new tenants had there been a rejection which would have given the lessor a claim for damages.

In *C. D. Stimson Co. v. Porter*, 195 F.2d 410 (10th Cir. 1952), the landlord appealed a decision denying a claim for damages resulting from rejection of his lease. The Bankruptcy Court also denied the landlord's claim ". . . for alterations and changes required in re-renting the premises." This was based on the holding ". . . that under the terms of the lease, the lessee was not liable for the changes and alterations made for the purpose of re-renting the premises." *C. D. Stimson Co. v. Porter, supra* at 412. The Court of Appeals reversed denial of the claim for damages. With respect to the remodeling expenses, the court stated:

> The sum expended on the premises and which appellant seeks to recover, includes the cost of dividing the premises into two

18. *Affirmed,* 172 F.2d 37 (1st Cir. 1948), *cert. den.,* 336 U.S. 967, 69 S.Ct. 939, 93 L.Ed. 1118 (1949), *reh. den.* 337 U.S. 934, 69 S.Ct. 1493, 93 L.Ed. 1740 and 337 U.S. 961, 69 S.Ct. 1529, 93 L.Ed. 1760 (1949).

rental units, putting in two rest rooms and other major alterations. Undoubtedly, the expenses reasonably necessary in order to obtain a tenant and mitigate damages under the lease should be assessed against the lessee. But, changes like these, of such substantial and permanent character, redounding as they do to the benefit of the lessor, are not proper items of damages.

*C. D. Stimson Co. v. Porter, supra* at 414.

The Bankruptcy Court's order in this case allowed certain remodeling expenses and disallowed others because it was impossible to determine the increase in value accruing to Corondolet on the four properties.[19] In view of the authorities discussed above, the trustee's view that Corondolet's recovery is limited to items treated as "rent" in the leases is too narrow. Corondolet is entitled to recover reasonable expenses incurred in mitigating the damages but is not entitled to recover for expenses incurred in making long-term capital improvements since those expenditures will ultimately benefit Corondolet. The order appealed from shows that the Bankruptcy Court attempted to distinguish the items of expense which resulted in substantial improvement and therefore enhanced the value of the property to the lessor, from those items of expense which were reasonably necessary to relet the property. The order thus shows that the correct standards were applied to the claims in question.

The fact that it was impossible to ascertain the exact breakdown between allowable mitigation expenses and expenses incurred for permanent improvements does not affect the Bankruptcy Court's order. So long as the proper legal standards were applied to the facts, it was for the Bankruptcy Court, as the trier of fact, to determine which items were properly allowable. In a different context, although speaking to the issue of damages for rejection of a lease, the Supreme Court stated:

> Judges in equitable proceedings will have the advantage of evidence in applying the usual rules as the measure of damages.

It is well understood that such evidence must show damages to a reasonable certainty. Mere "plausible anticipation" does not merit consideration nor are flights into the realm of pure speculation entitled to be treated as evidence. [Footnote omitted.] The determination of the amount to be allowed as the damage will be based on evidence which satisfies the mind.

*Connecticut Ry. and Lighting Co. v. Palmer*, 305 U.S. 493, 505, 59 S.Ct. 316, 324, 83 L.Ed. 309 (1939). See also, *Palmer v. Connecticut Ry. and Lighting Co.*, 311 U.S. 544, 561, 61 S.Ct. 379, 85 L.Ed. 336 (1941). Upon careful consideration of the entire record, it cannot be said that the order appealed from is based on facts which are clearly erroneous. Rule 810, Rules of Bankruptcy Procedure; *In re Uhlenhopp*, 508 F.2d 412, 414 (8th Cir. 1975). Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the order of the Bankruptcy Court allowing in part Claims Nos. 1485, 1486 and 1487 be, and hereby is, affirmed.

---

**19.** See text at note 10, *supra*.